# THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THE NAVAJO NATION, a sovereign Indian
Nation, DINÉ DEVELOPMENT
CORPORATION, a corporation wholly-owned
by and formed under the laws of the Navajo
Nation, and NAVAJO ARTS AND CRAFTS
ENTERPRISE, a wholly-owned instrumentality
of the Navajo Nation,

      Plaintiffs,

v.

                                            No. Civ. 12-195 LH/WDS

URBAN OUTFITTERS, INC., UO.COM,
L.L.C., URBAN OUTFITTERS
WHOLESALE, INC., ANTHROPOLOGIE,
INC., ANTHROPOLOGIE.COM, L.L.C., and
FREE PEOPLE of PA, L.L.C., Pennsylvania
Corporations, and FREEPEOPLE.COM, L.L.C.,
a Delaware Corporation,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On September 20, 2012, Defendants Urban Outfitters, Inc.; UO.com, L.L.C.; Urban
Outfitters Wholesale, Inc.; Anthropologie, Inc.; Antrhopologie.com, L.L.C.; Free People of PA,
L.L.C.; and Freepeople.com, L.L.C. (collectively "Defendants") filed a Motion to Transfer
Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. 38).  The parties submitted briefs in support of and
in opposition to the motion.  Additionally, Plaintiffs The Navajo Nation, the Diné Development
Corporation ("DDC"), and the Navajo Arts and Crafts Enterprise ("NACE") (collectively,
"Plaintiffs" or "The Navajo Nation") filed a Motion for Leave to File Sur-Reply to Defendants'

Motion to Transfer Venue (Doc. 47).  This Court, having considered the pleadings, motions,

briefs, relevant law, and otherwise being fully advised, concludes that Plaintiff's motion to file a

sur-reply will be granted and Defendants' motion to transfer venue will be denied.[1]

## I.      INTRODUCTION

### A.      THE PARTIES

The Navajo Nation is a sovereign Indian Nation with over 300,000 enrolled members.

Am. Compl. (Doc. 30) ¶ 9.  It owns controls, and exercises jurisdiction over a semi-autonomous

territory spanning more than 27,000 square miles in northeastern Arizona, the southeastern

portion of Utah, and northwestern New Mexico.  *Id.*  The Navajo Nation Tribal Government's

company headquarters are located in Window Rock, Arizona.  *See* Def.'s Mot., Ex. 1 (Doc. 39-1)

at 1.  The Navajo Nation is an institution that acts through its political subdivision, the Division

of Economic Development; its wholly-owned instrumentalities, NACE and DDC; its officers,

employees, and authorized agents; and its members, the Navajo People.  Am. Compl. (Doc. 30)

¶ 9.

Defendant Urban Outfitters, Inc., ("Urban Outfitters") is an international retail company

that markets and retails its merchandise in its more than 200 stores located internationally and

nationally and on the internet.  *See id.* ¶ 13.  Defendants UO.com, L.L.C.; Urban Outfitters

Wholesale, Inc.; Anthropologie, Inc.; Anthropologie.com, L.L.C.; Free People of PA, L.L.C.;

and FreePeople.com, L.L.C. are wholly-owned subsidiaries of Urban Outfitters.  *Id.* ¶¶ 14-17.

The subsidiaries are not separate autonomous entities, but rather are "brands" of Urban

Outfitters.  *Id.* ¶ 18.  All seven of the Defendants' corporate headquarters are located in

Pennsylvania.  *See* Def.'s Mot., Ex. 5 (Doc. 39-5) at ¶¶ 3-8.

---

[1] Defendants requested oral argument on the motion to transfer venue.  Defs.' Notice (Doc. 45).  Given the thoroughness of the parties' briefs, the Court finds that oral argument is unnecessary and will deny that request.

Defendants sell fashion apparel, accessories, and home goods.  Am. Compl. (Doc. 30) ¶ 33.  Defendants had sales of approximately $2.5 billion in fiscal year 2012.  *Id.* ¶ 34. Defendants purchased merchandise from numerous vendors; in fiscal year 2012, they did business with approximately 3,400 vendors.  *Id.* ¶ 35.  Urban Outfitters' Free People wholesale division sells the Free People brand worldwide through approximately 1,400 department and specialty stores, as well as through Free People and Urban Outfitters stores.  *Id.* ¶ 36. Defendants admit that their goods reach New Mexico.  Def.'s Mot. (Doc. 39) at 7.  Urban Outfitters operates a store in Albuquerque, New Mexico, and transacts business through the Internet in New Mexico.  Am. Compl. (Doc. 30) ¶ 20.  Free People does not operate any physical stores in New Mexico, but has four stores in Pennsylvania, among other locations around the nation. *See* Def.'s Mot., Ex. 8 (Doc. 39-8) at 1-3.

## B.    THE ALLEGATIONS OF THE COMPLAINT

The Navajo Nation alleges that it and its members have been known by the name "Navajo" since at least 1849, have continuously used the NAVAJO trademark in commerce, and have made the NAVAJO name and trademarks famous with numerous products, including, among other things, clothing, accessories, blankets, jewelry, foods, tools, decorations, crafts, and retail services.  Am. Compl. (Doc. 30) ¶ 3.  Plaintiffs state that they have registered 86 trademarks using the NAVAJO component with the United States Patent and Trademark Office ("USPTO") on the Principal Register for a variety of different classes of goods and services, including clothing, jewelry, house wares, and accessories.  *Id*. ¶¶ 3, 27.  Plaintiffs allege that the trademark NAVAJO mark is inherently distinctive, and given the incontestable status of its registration, the trademark may not be challenged as merely descriptive.  *Id.* ¶ 29.  The Navajo Nation asserts that its NAVAJO marks are prominently featured on its and its agents' websites.

*Id.* ¶ 30.  Plaintiffs contend that its famous NAVAJO mark is broadly recognized by purchasers of consumer goods and the general public as a trademark for the Navajo Nation's Indian-styled and Indian-produced goods.  *Id.* ¶ 31.

The Navajo Nation asserts that, at least as early as March 16, 2009, Defendants have used "Navajo" and "Navaho" as names and marks in direct competition with NAVAJO-branded goods.  *See id.* ¶¶ 5, 37.  The Navajo Nation has brought suit against Defendants, claiming trademark infringement, trademark dilution, unfair competition, false advertising, commercial practices laws violations, and violation of the Indian Arts and Crafts Act.  Specifically, Plaintiffs allege in Count One that Defendants' use of the "Navajo" and "Navaho" mark in connection with the sale of clothing, jewelry, house ware, footwear, and similar items is likely to cause confusion, mistake, or deception in the market place, and has created actual confusion in the market place, and constitutes trademark infringement in violation of 15 U.S.C. §§ 1114 and 1117 of the Lanham Act.[2]  *See id.* ¶¶ 81-91.  In Count Two, Plaintiffs assert that Defendants' use of the "Navajo" and "Navaho" names and marks to promote, market, and sell its retail items constitutes willful Trademark Dilution by blurring, and willful Trademark Dilution by tarnishment under § 1125(c) of the Lanham Act.  *See id.* ¶¶ 92-96.  Plaintiffs contend in Count Three that Defendants' are also liable for Unfair Competition and False Advertising under § 1125(a) of the Lanham Act based on false advertising and infringement of the Navajo Nation's unregistered NAVAJO trademarks.  *See id.* ¶¶ 97-101.

In Count Four, Plaintiffs allege that Defendants violated the Indian Arts and Crafts Act, 25 U.S.C. § 305 *et seq.*, ("IACA") by offering, advertising, marketing, displaying for sale, and selling goods that falsely suggest Defendants' products are products of an Indian Tribe, when in fact they are not products of any Indian Tribe.  *See id.* ¶¶ 102-22.  Plaintiffs contend that the

---

[2] The Lanham Act is found at 15 U.S.C. §§ 1051 *et seq.*

damages suffered include lost sales by members of the Navajo Nation, lost profits through driven-down prices caused by Defendants' imitation products, and loss of goodwill and reputation. *See id.* ¶ 112.

Plaintiffs assert state law claims in the two remaining counts. In Count Five, Plaintiffs contend that Defendants are liable for violation of the New Mexico Unfair Practices Act ("NMUPA"), N.M. Stat. Ann. § 57-12-3, through its sale of goods under the "Navajo" and "Navaho" names and trademarks, as well as its sale of other goods falsely represented as authentic goods, when Defendants knew that their goods were not made by, in connection, or in any way associated with the Navajo Nation, another Indian Tribe, nor any other Indian organization or person. *See id.* ¶¶ 123-28. Finally, Plaintiffs allege in Count Six that Defendants' willfully committed acts and omissions caused dilution and/or tarnishment of the distinctive quality of the Navajo Nation's NAVAJO marks in violation of the New Mexico Trademark Act ("NMTA"), N.M. Stat. Ann. § 57-3B-15. *See id.* ¶¶ 129-33.

## II.    PROCEDURAL BACKGROUND

On October 12, 2011, the Navajo Nation Department of Justice sent Urban Outfitters a "Cease and Desist" letter, dated June 30, 2011, demanding that Urban Outfitters cease using the "Navajo" name on, and in relation to, their products. *See* Am. Compl., Ex. B (Doc. 30-1) at 39-41 of 41; Def.'s Mot. to Dismiss, Ex. I (Doc. 33-9) at 1, 4 of 6. Within a week of receiving the letter, Urban Outfitters took steps to remove the term "Navajo" from its web pages in order to avoid potential litigation. *See* Def.'s Mot. to Dismiss, Ex. I (Doc. 33-9) at 1 of 6.

On October 19, 2011, the Los Angeles Times reported: "Urban Outfitters appears to have caved to the Navajo Nation. As of Wednesday, the trendy chain store had removed the word 'Navajo' from the description of about 20 items on its website. . . . Urban Outfitters has

replaced the word 'Navajo' with 'printed.'"  Deborah Netburn, *Navajo Nation Takes on Urban Outfitters, and Wins*, Los Angeles Times (Oct. 19, 2011, 5:13 PM), http://latimesblogs.latimes.com/nationnow/2011/10/navajo-nation-takes-on-urban-outfitters-wins.html.

On or around October 20, 2011, the Navajo Nation Department of Justice issued the following press release:

> The Navajo Nation Department of Justice is aware of the Urban Outfitters Corporation's recent removal of the Navajo name from its online marketing and retailing of its products.  The Urban Outfitters Corporation's recent removal of the Navajo name from its online marketing and retailing are positive actions that are more consistent with the corporation's responsibilities than previously demonstrated.  If the company has also ceased using the Navajo name in conjunction with its merchandise in its retail stores and print-media advertising, these are encouraging steps by the company towards amicably resolving this matter. While the Navajo Nation is certainly committed to protecting its distinctive name and trademarks; the Navajo Nation is also committed to avoiding unnecessary controversy and beneficially resolving matters concerning the unprivileged use of the Navajo name.  The Navajo Nation appreciates actions such as those recently taken by Urban Outfitters, and encourages other companies to take similarly responsible measures in the future.

*See* Def.'s Mot. to Dismiss, Ex. I (Doc. 33-9) at 6 of 6.

On February 28, 2012, Plaintiffs filed the current action against Defendants.  Compl. (Doc. 1).  On April 30, 2012, Defendants filed a Motion to Dismiss the Complaint (Doc. 16). Plaintiffs filed an Amended Complaint (Doc. 30) on May 21, 2012, prompting Defendants to file a Motion to Dismiss the Amended Complaint (Doc. 33) on June 22, 2012.

On August 3, 2012, Mark A. Griffin, counsel for Plaintiffs, sent a letter to defense counsel asking that their clients confirm that, during the pendency of the litigation, they would refrain from using "Navajo" in conjunction with their sale of clothing jewelry and accessories, and notifying them that, if they did not extend such a promise, the Navajo Nation would file a motion for preliminary injunction.  Decl. of Mark A. Griffin, Ex. A (Doc. 41-1) at 1 of 14.

Counsel for defendants, H. Jonathan Redway, responded to the letter on August 10, 2012, stating that there was no basis for entry of a preliminary injunction, because each defendant instructed its employees to discontinue use of the term "Navajo," as an accommodation to the Navajo Nation and to avoid potential costs and disruptions "that any litigation, even baseless litigation, causes and not because it was under any legal to do so." *Id.*, Ex. B (Doc. 41-1) at 5 of 14.  On August 31, 2012, Plaintiffs' counsel notified defense counsel that based on Defendants' representations the Navajo Nation would not file a preliminary injunction motion at that time. *See id.*, Ex. C (Doc. 41-1) at 7 of 14.

On September 20, 2012, Defendants filed the motion to transfer venue (Doc. 38) at issue here.  Subsequently, by letter dated September 21, 2012, Plaintiffs asserted that they had "evidence that an Obey cap and other items were offered for sale in an Urban Outfitters' store in Evanston, Illinois on August 22, 2012 tagged with the word 'Navajo'" and threatened to file a motion for preliminary injunction in the absence of an explanation. *Id.*, Ex. D (Doc. 41-1) at 8-9 of 14.  By letter dated October 1, 2012, with the heading "For Settlement Purposes Only Subject to Federal Rule of Evidence 408 Not Admissible for Any Purpose," counsel for Defendants responded, categorically denying any wrongdoing.  *Id.*, Ex. E (Doc. 41-1) at 10-12.  Defense counsel also provided an explanation regarding the Obey[3] cap in question.  *See id.*

On October 9, 2012, Plaintiffs filed a response (Doc. 40) to Defendants' motion to transfer.  Plaintiffs attached to their response the aforementioned letters regarding the potential filing of a preliminary injunction.  Defendants filed their reply (Doc. 44) in support of their motion to transfer and argued in footnote 3 that the Court should order Plaintiffs "to withdraw its public filing, Dkt. 41-1, pp. 5-6, 10-12, which are letters sent under Fed. R. Evid. 408 in an effort

---

[3] Obey is an independent company from Defendants that sells clothing and other items.  *See* Pl.'s Resp., Ex. E (Doc. 41-1) at 10-11 of 14.

to assist in settlement of this case and which were improperly filed with this Court." Defs.' Reply (Doc. 44) at 5 n.3. The referenced pages refer to Exhibit B, the August 10, 2012 letter from defense counsel explaining why there is no basis for the entry of a preliminary injunction against Defendants, and to Exhibit E, the October 1, 2012 letter from defense counsel further detailing why there is no basis for Plaintiffs to seek a preliminary injunction and offering an explanation concerning the Obey cap that Plaintiffs argued violated their trademark.

Plaintiffs subsequently filed a motion for leave to file a sur-reply (Doc. 47) in order to address the request made in Defendants' reply brief to strike Plaintiffs' Exhibits B and E. Plaintiffs' proposed sur-reply provides a legal argument against striking their exhibits. The Court has considered the motion, as well as the arguments made in Defendants' opposition to Plaintiffs' motion for leave to file the sur-reply, and finds that the arguments presented in the sur-reply are helpful to the Court in resolving the issue concerning whether Exhibits B and E are relevant or should be stricken from the record. The Court will therefore grant Plaintiffs' motion to file the sur-reply.

Regarding Defendants' request to strike from the record Exhibit B (Doc. 41-1 at 5-6 of 14) and Exhibit E (Doc. 41-1 at 10-12 of 14), the Court finds that Plaintiffs offered Exhibits B and E to refute Defendants' argument that Plaintiffs "sandbagged" them into believing this matter had been resolved in order to file their suit in an inconvenient forum. The Court concludes that the purpose for which Plaintiffs attached those exhibits was not to prove the underlying claim or to impeach by a prior inconsistent statement, and thus, Rule 408 does not apply.[4] The Court will therefore deny Defendants' request to strike the exhibits. The Court, however, notes that it had no need to rely on Plaintiffs' Exhibits B and E in resolving the motion

---

[4] Federal Rule of Evidence 408 provides that "conduct or a statement made during compromise negotiations about the claim" is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."

to change venue, because Defendants did not present sufficient evidence to demonstrate that Plaintiffs' public statements were intended solely to induce Defendants to not file a declaratory judgment action in a different, more convenient forum, such that this Court must disregard the deference given to a plaintiff's choice of forum.[5]

## III.   STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ."  28 U.S.C. § 1404(a).  As an initial matter, it is not disputed that the Eastern District of Pennsylvania is a district where this case could have initially been brought. Accordingly, the first requirement for transfer is met, and this Court must consider whether convenience to the parties and witnesses and the interests of justice compel transfer.

A district court enjoys greater discretion to transfer a case under § 1404(a) than to dismiss the action based upon forum non conveniens.  *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991).  A court should decide motions to transfer on an individualized, case-by-case basis.  *Id.* at 1516.  "The party moving to transfer a case pursuant to § 1404(a) bears the burden of establishing that the existing forum is inconvenient." *Id.*  In considering a motion to transfer, the court should consider the following discretionary factors:

---

[5] Although the Court finds that there is insufficient evidence to show that Plaintiffs attempted to "sandbag" Defendants through their public representation made on October 14, 2011, the Court also finds insufficient evidence to support Plaintiffs' assertion that Defendants used the term and argument in order to "play[] on historic stereotypes of Native American Indians engaging in surprise attacks and raids on non-Indian wagon-trains and settlers," Pls.' Resp. (Doc. 40) at 3.  The origins of the term "sandbag" appear to involve no references to Native Americans.  *See* Dictionary.com,  http://dictionary.reference.com/browse/sandbag (noting that origin of term "sandbag" is in the poker-playing context, which is perhaps from sandbagger in the sense of a bully or ruffian who uses a sandbag as a weapon to knock his intended victim unconscious).  The Court encourages the parties to stick to the facts and refrain from using inflammatory, irrelevant arguments that unnecessarily drive up the costs of litigation, usurp the Court's time, and potentially increase the friction between the parties.  At the outset of this litigation, the parties should strive to set the bar higher.

the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and[ ] all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010) (quoting *Chrysler Credit Corp.*, 928 F.2d at 1516). "Merely shifting the inconvenience from one side to the other, however, obviously is not a permissible justification for a change of venue." *Id.* (quoting *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992)). Unless the balance of interests "is strongly in favor of the movant the plaintiff's choice of forum should rarely be disturbed." *Scheidt*, 956 F.2d at 965 (quoting *William A. Smith Contracting Co. v. Travelers Indem. Co.*, 467 F.2d 662, 664 (10th Cir. 1972)).

## IV.   ANALYSIS

### A.   Plaintiff's Choice of Forum

Although the plaintiff's choice of forum should rarely be disturbed, courts should give less deference to the plaintiff's choice of forum when the plaintiff does not reside in the district. *Employers Mut. Cas. Co.*, 618 F.3d at 1167-68. "Courts also accord little weight to a plaintiff's choice of forum where the facts giving rise to the lawsuit have no material relation or significant connection to the plaintiff's chosen forum." *Id.* The location of any alleged damage or loss may be significant for purposes of analyzing this factor. *See id.*

Although Plaintiffs allege in their Amended Complaint that they reside in this district, *see* Am. Compl. (Doc. 30) ¶ 23, the parties dispute whether this district is in actuality plaintiff's home forum. The Navajo Nation owns and controls land in Arizona, Utah, and New Mexico.

10

Defendants argue that the District of New Mexico is not the Nation's home forum because "the overwhelming majority of its territory and tribal members are in fact located outside of New Mexico," and the capitol of the Navajo Nation is located in Window Rock, Navajo Nation, Arizona.  Defs.' Reply (Doc. 44) at 2-3.  Plaintiffs argue that their own tribal court is their home forum, but that federal courts have held that a tribe's home forum for venue purposes is where the Indian tribe's reservation is located.

Plaintiffs cite *Shawnee Tribe v. United States*, 298 F.Supp.2d 21 (D.D.C. 2002), for this proposition, but Defendants correctly point out that the *Shawnee Tribe* case did not hold that a tribe's home forum is in each state in which the tribe resides.  In *Shawnee Tribe*, the tribe filed suit in the District of Columbia, which clearly was not their home forum.  *See id.* at 24-25.  The court transferred the case back to Kansas, where the property in dispute was located, and where the tribe was located, but the court did not reach the issue of what test to use to determine where a tribe resides when a tribe is located in multiple states.  *See id.* at 25-27.

Defendants' reliance on *Wyandotte Nation v. Salazar*, 825 F.Supp.2d 261, 268-69 (D.D.C. 2011), however, also does not resolve the pertinent issue here.  The district court there held that the tribe's choice of Washington, D.C., as a forum was entitled to little deference, because the tribe did not reside and had no substantial connections to Washington, D.C.  *See id.* at 268.  The court noted that the plaintiff maintained its seat of tribal government in Oklahoma and the property subject to the dispute was located in Kansas.  *See id.* at 268-69.  The court transferred the case to the District of Kansas.  *Id.* at 271.

Neither case cited by the parties decided what the home forum test for venue purposes should be for a tribe whose reservation lands span multiple states, as here.  Nor has this Court found a case directly on point regarding venue analysis, although there are cases regarding a

11

tribe's citizenship for purposes of jurisdiction.  For jurisdictional purposes, an Indian tribe is not considered to be a citizen of any state and is analogous to a stateless person.  *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Housing Authority*, 207 F.3d 21, 27 (1st Cir. 2000); *Gaines v. Ski Apache*, 8 F.3d 726, 729 (10th Cir. 1993).   A tribe may become a corporation by being chartered under the Indian Reorganization Act, 25 U.S.C. § 477, and would be considered a citizen of the state of its principal place of business for diversity jurisdiction purposes.  *Gaines*, 8 F.3d at 729.  "A tribe may also charter a corporation pursuant to its own tribal laws, and such a corporation will be considered a citizen of a state for purposes of diversity jurisdiction."  *Id.*  At least one circuit has held that an Indian corporation, formed under tribal law, is a citizen of the state where it has its principal place of business.  *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 724 (9th Cir. 2008) ("We hold that, for diversity purposes, a tribal corporation formed under tribal law is not a citizen of a state merely because its incorporation occurred inside that state. ACE is thus only a citizen of Nevada, the location of its principal place of business.").  *See also* 28 U.S.C. § 1391(c)(2) ("[A]n entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, . . . if a plaintiff, only in the judicial district in which it maintains its principal place of business.")

For venue purposes, a corporate plaintiff generally is deemed to reside at its principal place of business.  *See Waste Distillation Tech., Inc. v. Pan Am. Res., Inc.*, 775 F.Supp. 759, 764 (D. Del. 1991) (examining corporation's principal place of business when determining whether corporate plaintiff brought suit in its home forum).  This principal place of business test is particularly appropriate for a corporation organized under tribal laws, rather than state law, as the state of incorporation test would not shed light on the residence issue.  Here, the DDC is a corporation owned by the Navajo Nation and formed under the laws of the Navajo Nation.  Am.

Compl. (Doc. 30) ¶ 10.  The parties do not discuss where the DDC's principal place of business is located, and thus, the Court cannot use DDC's residence to aid in the analysis.  NACE is a wholly owned instrumentality of the Navajo Nation.  *Id.* ¶ 11.  Based on the allegations of the complaint, NACE does not appear to be a corporate entity separate from the Navajo Nation.

In determining Plaintiffs' "home forum," the Court will therefore turn to the policy reason behind placing significance on the "home forum" – that the court may presume that the chosen forum is convenient to the plaintiff.  *See Burstein v. Applied Extrusion Techs., Inc.*, 829 F.Supp. 106, 110 (D. Del. 1992) ("The forum chosen by the Plaintiff must reflect rational and legitimate concerns.  When the plaintiff has chosen to bring suit in a district that is not his 'home turf' and which has no connection to any of the acts giving rise to the lawsuit, the convenience to the plaintiff is not as great as it would be were [he] litigating at or near [his] principal place of business or at the site of the activities at issue in the lawsuit.") (internal citation and quotations omitted); *Waste Distillation Tech.*, 775 F.Supp. at 764 ("The movant's burden is easier where the plaintiff has not brought suit on its 'home turf' because the interest in litigating in a convenient forum is reduced.").  *See also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981) ("When the home forum has been chosen, it is reasonable to assume that this choice is convenient.  When the plaintiff is foreign, however, this assumption is much less reasonable.  Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference.").  Even if a tribe may have only one "home forum," and even if Arizona were to be deemed the Navajo Nation's "home forum," for purposes of this presumption of convenience, the District of New Mexico is certainly also a forum easily deemed convenient for Plaintiffs and is not merely a forum that is largely fortuitous.

It is undisputed that four million of the Navajo Nation's acres of land are located in the

New Mexico portion of the reservation; the eastern edge of the Tohajiilee portion is only 17 miles from downtown Albuquerque; and approximately 112,000 members of the Navajo Nation reside in New Mexico.  Furthermore, Defendants also have a connection to this District because they sell their goods in New Mexico through the internet and through two stores in the state.[6]  It is undisputed that Plaintiff NACE has two stores in New Mexico and has sold products through several trade shows in New Mexico.  *See* Decl. of J.T. Willie (Doc. 43) ¶¶ 5, 7-9.  Consequently, some of the alleged injuries and allegedly infringing acts occurred in New Mexico.

Defendants nevertheless argue that this case does not have a significant connection to this forum because they have 10 stores located in the Eastern District of Pennsylvania, they operate nationally and internationally, and they have a national online presence.  While this extensive presence outside this state shows that the allegedly infringing acts took place in many locations, including Pennsylvania, it also shows that there is no one forum that can easily be isolated as the location where the majority of operative events took place.  The fact that some of the infringing acts occurred in the forum state is a significant enough connection to give the preference to the plaintiff's chosen forum.  *See ESPN, Inc. v. Quiksilver, Inc.*, 581 F.Supp.2d 542, 549 (S.D.N.Y. 2008) (finding in trademark infringement case that locus of operative facts was in chosen forum because some of defendant's products were marketed and sold in forum state, even though defendant marketed and sold its products nationally and developed and designed its products in transferee forum).  There is thus a sufficiently significant connection between this District and to Plaintiffs and to the events giving rise to the lawsuit that the plaintiff's-choice-of-forum factor weighs in favor of Plaintiff.  *Cf. Employers Mut. Cas. Co.*, 618 F.3d at 1157, 1168 (holding that, even though plaintiff was an Iowa corporation that did not reside in forum state of Wyoming for

---

[6] The Amended Complaint states that Defendants operate a store in Albuquerque, *see* Am. Compl. (Doc. 30) ¶ 20, but there appear to be two Albuquerque stores operated by Defendants, an Urban Outfitters store and an Anthropologie store, *see* Pls.' Resp. (Doc. 40) at 8.

purposes of § 1404(a), plaintiff's choice of forum weighed against transferring declaratory judgment action as to insurer's duty to defend or indemnify defendant sub-contractor, because allegedly negligent roofing work that was at heart of underlying litigation occurred on hotel in Wyoming); *ESPN, Inc.*, 581 F.Supp.2d at 549 ("'In action alleging trademark infringement or unfair competition, courts in this district have held the locus of operative facts to be in the initially chosen forum if acts of infringement, dilution, or unfair competition occur in that forum.' . . . 'Thus, if the allegedly infringing products are sold within the Southern District of New York, even if sold elsewhere, there exists a sufficient connection with this District.'") (quoting *Kiss My Face Corp. v. Bunting*, No. 02CIV2645 (RCC), 2003 WL 22244587, at *3 (S.D.N.Y. Sept. 30, 2003)); *Waste Distillation Tech.*, 775 F.Supp. at 764-65 (denying transfer despite fact that action was not in district where plaintiff resided, because chosen district was one closest to plaintiff's residence in which personal jurisdiction over defendants could be obtained).

As for Defendants' argument that Plaintiffs are merely forum shopping, the Court finds that both parties equally appear to be forum-shopping for convenience. The Court nonetheless finds that the aforementioned connections between Plaintiffs and this District and between the events giving rise to this lawsuit and this District require this Court to give substantial deference to Plaintiffs' chosen forum in the venue transfer analysis.

### B.    Accessibility of Witnesses and Sources of Proof

"The convenience of witnesses is the most important factor in deciding a motion under § 1404(a)." *Employers Mut. Cas.*, 618 F.3d at 1169 (quotations omitted). The availability and convenience of key witnesses with material testimony may outweigh the convenience to numerous, but less important witnesses. *See id.* To show inconvenience, the movant must identify the witnesses and their locations, (2) indicate the quality or materiality of their

testimony, and (3) show that the witnesses were unwilling to come to trial, that deposition testimony would be unsatisfactory, or that the use of compulsory process would be necessary. *Id.* (quoting *Scheidt*, 956 F.2d at 966).  The ability to compel the attendance of witnesses is generally relevant only to third-party witnesses, because employees of the parties, as a practical matter, will be available in any venue by virtue of the employment relationship.  *See Glass v. S & M NuTec, LLC*, 456 F.Supp.2d 498, 503-504 (S.D.N.Y. 2006); *Empty Barge Lines II, Inc. v. DREDGE LEONARD FISHER*, 441 F.Supp.2d 786, 793 (E.D.Tex. 2006).

Defendants contend that their pertinent buyers and the pertinent marketing personnel, as well as virtually all of the pertinent documents are located in and around Pennsylvania.  They argue it will be less expensive and convenient for the employee witnesses from seven different Pennsylvania companies to participate in litigation in Pennsylvania than in New Mexico. Defendants, however, refer generally to employee witnesses, but have not identified them by name or indicated the quality of each employee's testimony.  Even assuming that there are numerous employees who will testify concerning material information, Defendants have not shown that these employees would be unwilling to participate in the litigation here.  *See, e.g., Empty Barge Lines II, Inc.*, 441 F.Supp.2d at 793 ("Where the key witnesses are employees of the party seeking a transfer, their convenience is entitled to less weight because the party is able to compel their attendance.").

Defendants further assert that important third-party witnesses will be beyond the reach of the subpoena power of this Court, but within the subpoena power of the Eastern District of Pennsylvania.  Defendants refer to the following third-party suppliers and witnesses:  Dukes supplied the "Magical Feather Bag," and Defendants' point of contact with Dukes is located in New York City, New York, Def.'s Mot., Ex. 2 (Doc. 39-2) ¶ 3; Pendleton Woolen Mills, Inc.,

which provides the "Navajo Weekender Bag," has a branch location in Pennsylvania, *id.*, Ex. 3 (Doc. 39-3) ¶ 3; Lucca Cuture ("Lucca") supplies the "Lucca Couture Navajo Pullover Sweater," and Urban Outfitters, Inc.'s point of contact with Lucca is located in New York City, New York, *id.*, Ex 3 (Doc. 39-3) ¶ 4; and Woolrich, Inc., which provides the "Vintage Men's Woolrich Navajo Jacket," is located in Pennsylvania, *id.*, (Ex. 3 (Doc. 39-3) ¶ 5. Defendants contend that the testimony of these third-party suppliers will establish that the suppliers are responsible for the accused clothing and that the items were marked with "Navajo," not to identify the source of the products, but rather to identify the type of design, which is recognized by the consuming public as a generic term for a fashion trend. Furthermore, Defendants assert that they believe that a number of the vintage items depicted in Exhibit A to the Amended Complaint and sold by Free People are one-of-a-kind items made by individuals who self-identify as Navajo Indian or who are otherwise enrolled in the Navajo Indian tribe, and these items are typically purchased from a vendor believed to be located in New Jersey, approximately 50 miles from Philadelphia. *See* Def.'s Mot., Ex. 4 (Doc. 39-4) ¶¶ 3-6.[7]

Plaintiffs counter that Pendleton is headquartered in Portland, Oregon, and Lucca is headquartered in Los Angeles, California, both of which are closer to Albuquerque than Philadelphia.[8] Only half the third-party companies noted by Defendants are located closer to the proposed transferee court. Moreover, Defendants have not identified who within those companies would testify and where those persons work or reside. With regard to convenience and cost, Defendants have thus not shown that the location of third-party witnesses compel transfer of this case. Although Defendants have asserted why employees of these third-party

---

[7] Defendants also point out that all the attorneys in this case are located outside of New Mexico. The convenience of counsel, however, is not a factor this Court will consider. *See In re Horseshoe Entertainment*, 337 F.3d 429, 434 (5th Cir. 2003); *Solomon v. Continental Am. Life Ins. Co.*, 472 F.2d 1043, 1047 (3d Cir. 1973).

[8] Plaintiffs cite to internet source pages to support their assertion. Defendants, however, do not dispute these facts.

suppliers may have material testimony, they have not provided any evidence regarding the third prong of the "inconvenience" test -- that the proposed witnesses from these third-party suppliers would not voluntarily come to trial, or that deposition testimony is insufficient, or that compulsory process would be required. *See Employers Mut. Cas.*, 618 F.3d at 1169. The Court will not presume that these out-of-state third-party suppliers will not voluntarily come to trial, especially given that these suppliers have a business relationship with Defendants, which could create the necessary incentive to participate in the litigation.

Regarding the proposed testimony that vintage items may have been made by individuals who self-identify as Navajos, Defendants only mention an un-identified vendor "believed" to be located in New Jersey. Defendants do not identify the proposed witness, indicate whether the witness would have admissible testimony regarding the tribal affiliation of the manufacturers of the vintage items, or demonstrate that the witness would be unwilling to participate in the litigation.

Finally, Plaintiffs, in turn, identify a number of artisans who will testify that they are enrolled Navajo Nation members, they sell their goods across the United States under the NAVAJO trademark, and they sell similar products in similar marketing channels as Defendants. Plaintiffs contend that their evidence is important in the likelihood-of-confusion analysis. Plaintiffs argue that these necessary third-party witnesses reside in New Mexico and would refuse to travel to the Eastern District of Pennsylvania to testify at trial.[9] There thus does not appear to be one venue that enjoys absolute subpoena power for both depositions and trial over all the witnesses in this case.

In sum, Defendants have not shown that the majority of key witnesses are unwilling to

---

[9] Plaintiffs, however, only provided evidence that two of the named artisans would be unable to travel to Pennsylvania due to the distance and expense. *See* Decl. of Mark A. Griffin (Doc. 41) ¶ 9 & Ex. F (Doc. 41-1).

come to trial, that deposition testimony would be unsatisfactory, or that the use of compulsory process would be necessary.  Both parties have witnesses located in their respective districts. Merely shifting the inconvenience from one side to the other is not a permissible justification to change the venue.  *Employers Mut. Cas. Co.*, 618 F.3d at 1167.  Defendants have thus not met their burden of proving that the accessibility of witnesses and proof factor weighs in favor of transfer.  *Cf. id.* at 1169 (holding that accessibility of witnesses factor weighed against transfer because movant merely alleged that majority of potential witnesses were non-forum state residents and subject to compulsory process without identifying those witnesses with specificity or indicating subject matter of testimony).

As for the location of relevant documents, in this digital age, the costs of producing documents long distances have been dramatically reduced, and this factor is entitled to considerably less weight.  *See ESPN, Inc.*, 581 F.Supp.2d at 548 ("In an era of electronic documents, easy copying and overnight shipping, this factor assumes much less importance than it did formerly.").  Defendants have offered no evidence as to why the documents or other tangible evidence in this case would be difficult to produce in this forum, and thus the accessibility of sources of proof factor is neutral.  *See id.* at 549 ("In the absence of more information about why it would be so difficult to transport documents to New York from California, this factor is at best neutral.").

**C.     Cost of Making Necessary Proof**

Defendants argue that their costs for litigating this matter weigh in favor of transfer. Given that they constitute seven separate corporate entities, they assert that a large number of corporate representatives and employees will have to travel to attend trial in New Mexico, resulting in a great monetary cost to them.  On the other hand, Plaintiffs argue that the cost of

litigation factor weighs against transfer because the difference in economic means between Defendants and Plaintiffs is great, as Defendants are multi-billion dollar corporations that are far more able to bear the cost of litigating in a less convenient forum.

A court may consider the relative means of the parties when deciding a motion to transfer venue. *See Dwyer v. General Motors Corp.*, 853 F.Supp. 690, 693 (S.D.N.Y. 1994). In this case, the relative means of the parties is not clear cut. Plaintiffs refer the Court to census data showing that a large portion of the members of the Navajo Nation have incomes below the poverty level and are unemployed. Defendants, however, point out that the Plaintiffs in this case, the Navajo Nation itself and its corporate entity, have significantly greater assets than its individual members. *See AEC One Stop Group, Inc. v. CD Listening Bar, Inc.*, 326 F.SUpp.2d 525, 531 (S.D.N.Y. 2004) (noting that the factor of the disparate means of the parties is entitled to less weight when both parties are corporations). Although the Court will not rely on the relative means of the parties, given the deficient record as to the means of the Navajo Nation, the means of Defendants is nonetheless relevant. The costs to Defendants of trying suit in this District will likely be greater than if the case were transferred to the Eastern District of Pennsylvania. Urban Outfitters, however, had sales of approximately $2.5 billion in fiscal year 2012, and Defendants operate nationally and internationally. Defendants thus have the ability to bear the travel costs of litigation. Consequently, the cost-of-litigation factor only weighs slightly in favor of Defendants.

### D. Difficulties that May Arise from Congested Dockets

The most relevant statistics when evaluating the administrative difficulties of court congestion "are the median time from filing to disposition, median time from filing to trial, pending cases per judge, and average weighted filings per judge." *Employers Mut. Cas. Co.*, 618

F.3d at 1169 (citing Administrative Office of the United States Courts, Federal Court Management Statistics, *available at* http://www.uscourts.gov/cgi-bin/cmsd2008. pl (2008)).   A comparison of the 2011 Federal Court Management Statistics regarding judicial caseloads favors transfer.   *See* Administrative Office of the United States Courts, Federal Court Management Statistics, *available at* http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/DistrictCourtsDec2011.aspx.[10]

For civil cases in the Eastern District of Pennsylvania in 2011, the median time frame from the filing of a civil case to disposition is 1.5 months and from filing to trial is 20.5 months. The pending cases per judge in the Eastern District of Pennsylvania are 916, and the weighted filings per judge are 405.[11]   By contrast, the same statistics for the District of New Mexico are as follows:   median time from filing of civil case to disposition is 8.7 months; median time from filing of civil case to trial is 24.0 months; pending cases per judge are 336, and weighted filings per judge are 512.[12]   Based on these statistics, the Eastern District of Pennsylvania generally resolves civil cases faster than this District.   Although the Eastern District has a more congested docket in terms of pending cases per judge, when weighted filings statistics are considered, this District has a higher number of weighted filings per judge.   Consequently, this data indicates that this District has a more congested docket and, generally, does not resolve civil cases as quickly as the Eastern District of Pennsylvania. This public interest factor thus weighs in favor of transfer.

---

[10] This Court has used the most recent Judicial Caseload Profile ending December 31, 2011, while the parties used the profile ending September 30, 2011, which accounts for the slight variation in the statistics.

[11] Weighted filings statistics account for the different amounts of time judges require to resolve various types of cases.  Cases are weighted such that more time-consuming cases are given higher weights than cases demanding little time.  *See* Administrative Office of the United States Courts, Federal Court Management Statistics, "2011 Explanation of Selected Terms", *available at* http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/DistrictCourtsDec2011.aspx.

[12] The far greater majority of cases in this district are criminal felony cases.

**E.      Advantage of Having Local Court Determine Questions of Local Law**

"When the merits of an action are unique to a particular locale, courts favor adjudication by a court sitting in that locale." *Employers Mut. Cas. Co.*, 618 F.3d at 1170.  Plaintiffs argue that this factor weighs against transfer because they have brought New Mexico state law claims under the NMUPA and NMTA.  Defendants, however, have filed a motion to dismiss these state law claims and thus contend that this factor does not weigh in favor of Plaintiffs.  This Court has not yet addressed the merits of the state law claims, and without considering those substantive issues now, finds that this factor does not weigh in favor of either party.  Although generally there is an advantage of having local law decided by a local court, the Eastern District of Pennsylvania is well-versed in federal intellectual property law matters and the parties have not indicated that there is a substantial difference between the federal and local law such that the there is any disadvantage to the parties in having the Eastern District consider those claims.  In a similar vein, despite the fact that more intellectual property cases are filed in the Eastern District than here, that fact does not compel the Court to transfer, as all federal courts are presumed to be equally competent in federal question cases.  *See Cargill Inc. v. Prudential Ins. Co. of America*, 920 F.Supp. 144, 148 (D. Colo. 1996).

**F.      Remaining Factors**

The remaining factors are either neutral or irrelevant.  Defendant has not indicated that there are any questions regarding the enforceability of a judgment against it, that there exist conflict-of-law questions, that there are any obstacles to a fair trial here, or that any other considerations would make a trial easier or more expeditious or economical in the Eastern District of Pennsylvania than here in New Mexico.

V.      **CONCLUSION**

Having considered all the relevant factors under 28 U.S.C. § 1404(a), the Court concludes that the balance of factors weighs against transfer.  Defendants have not shown that critical witnesses would not be willing to participate in litigation in this District.  Although some of the factors weigh in Defendants' favor, transferring this case ultimately would do little more than shift the balance of inconvenience from Defendants to Plaintiffs.  Defendants have not met their burden of proving sufficient inconvenience to justify disturbing Plaintiffs' choice of forum.


**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Leave to File Sur-Reply to Defendants' Motion to Transfer Venue (**Doc. 47**) is **GRANTED**; and Defendants' Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (**Doc. 38**) is **DENIED**.


_____

SENIOR UNITED STATES DISTRICT JUDGE