## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE NAVAJO NATION, a sovereign Indian
Nation, DINÉ DEVELOPMENT
CORPORATION, a corporation wholly-owned
by and formed under the laws of the Navajo
Nation, and NAVAJO ARTS AND CRAFTS
ENTERPRISE, a wholly-owned instrumentality
of the Navajo Nation,

      Plaintiffs,

v.

                                     No. Civ. 12-195 LH/WDS

URBAN OUTFITTERS, INC., UO.COM,
L.L.C., URBAN OUTFITTERS
WHOLESALE, INC., ANTHROPOLOGIE,
INC., ANTRHOPOLOGIE.COM, L.L.C., and
FREE PEOPLE of PA, L.L.C., Pennsylvania
Corporations, and FREEPEOPLE.COM, L.L.C.,
a Delaware Corporation,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 22, 2012, Defendants Urban Outfitters, Inc.; UO.com, L.L.C.; Urban Outfitters

Wholesale, Inc.; Anthropologie, Inc.; Antrhopologie.com, L.L.C.; Free People of PA, L.L.C.;

and Freepeople.com, L.L.C. (collectively "Defendants") filed a Motion to Dismiss the Amended

Complaint and Memorandum in Support (Doc. 33).  Plaintiffs The Navajo Nation, the Diné

Development Corporation ("DDC"), and the Navajo Arts and Crafts Enterprise ("NACE")

(collectively, "Plaintiffs" or "The Navajo Nation") oppose the motion.  This Court, having

considered the pleadings, motions, briefs, relevant law, and otherwise being fully advised,

concludes that the motion to dismiss the amended complaint should be granted in part and denied in part as described herein, and that all Counts will remain in the case at this time.

## I.      FACTUAL BACKGROUND

The Navajo Nation is a sovereign Indian Nation with over 300,000 enrolled members. Am. Compl. (Doc. 30) ¶ 9.  The Navajo Nation is an institution that acts through its political subdivision, the Division of Economic Development; its wholly-owned instrumentalities, such as NACE and DDC; its officers, employees, and authorized agents; and its members, the Navajo People.  *Id*.

Defendant Urban Outfitters, Inc., ("Urban Outfitters") is an international retail company that markets and retails its merchandise in its more than 200 stores located nationally and internationally and on the internet.  *See id.* ¶ 13.  Defendants UO.com, L.L.C.; Urban Outfitters Wholesale, Inc.; Anthropologie, Inc.; Anthropologie.com, L.L.C.; Free People of PA, L.L.C.; and FreePeople.com, L.L.C. are wholly-owned subsidiaries of Urban Outfitters.  *Id.* ¶¶ 14-17. The subsidiaries are not separate autonomous entities, but rather are "brands" of Urban Outfitters.  *Id.* ¶ 18.

The Navajo Nation alleges in its Amended Complaint that it and its members have been known by the name "Navajo" since at least 1849, have continuously used the NAVAJO trademark in commerce, and have made the NAVAJO name and trademarks famous with numerous products, including, among other things, clothing, accessories, blankets, jewelry, foods, tools, decorations, crafts, and retail services.  *Id*. ¶ 3.  Plaintiffs assert that the Navajo Nation has registered 86 trademarks using the NAVAJO component with the United States Patent and Trademark Office ("USPTO") on the Principal Register for a variety of different classes of goods and services, including clothing, jewelry, house wares, and accessories.  *Id*.

¶¶ 3, 27.  Plaintiffs contend that many of their 86 registered trademarks have become incontestable under 15 U.S.C. § 1065,[1] including Trademark Registration Nos., 2,237,848; 2,976,666; 3,602,907; 3,787,515; 3,787,518; and 3,793,381.  *Id.* ¶ 28.[2]

Plaintiffs assert that they have invested substantial capital in promoting and protecting their NAVAJO trademarks, resulting in more than $500 million in sales of NAVAJO-branded goods.  *Id.* ¶ 4.  They contend that the NAVAJO marks are prominently featured on their and their agents' websites.  *Id.* ¶ 30.  Plaintiffs assert that its famous NAVAJO mark is broadly recognized by purchasers of consumer goods and the general public as a trademark for the Navajo Nation's Indian-styled and Indian-produced goods.  *Id.* ¶ 31.

Plaintiffs allege that the NAVAJO mark is inherently distinctive, and given the incontestable status of its registration, the trademark may not be challenged as merely descriptive.  *Id.* ¶ 29.  Plaintiffs contend that the mark is suggestive, arbitrary, or fanciful and that the NAVAJO mark is immediately recognized and associated with the Navajo Nation, thus serving as an identifier of source.  *Id.* ¶¶ 29, 46.  Further, Plaintiffs assert:

> "Navajo" is not a generic name for a class of products such as clothing jewelry or accessories.  "Navajo" is not the name of any genus of products, such as clothing, jewelry or accessories.  Customers do not go into an Urban Outfitters store, and ask for "a Navajo."  If they did, a sales person would not know how to assist them.

*Id.* ¶ 29. Plaintiffs contend that the term "Navajo" is not being used descriptively because "Navajo" means of or pertaining to the Navajo Nation or members of the tribe.  *See id.* ¶ 45. Instead of using descriptive words like "geometric" or "southwestern," they chose "Navajo" in

---

[1] Section 1065 of Title 15 of the United States Code generally states, as explained more thoroughly *infra*, that a registered mark may become "incontestable" through continuous use for five consecutive years after federal registration and after four additional enumerated statutory conditions have been met.  *See* 15 U.S.C. § 1065.

[2] Defendants contest this fact, arguing that the named Plaintiffs do not actually own all 86 trademark registrations, and of those they own, only five are incontestable.  Defs.' Mot. (Doc. 33) at 20; Defs.' Reply, Ex. A (Doc. 36-1) ¶¶ 4-7.

order "to trade off of the cachet and romanticism associated with the Navajo People, who form the Navajo Nation." *Id.* ¶ 46. Plaintiffs contend that Defendants falsely advertise a number of its "Navajo" products as "Vintage" and "Handmade," making an express claim that their goods are made by members of the Navajo Nation, when only enrolled members of the Navajo Nation may sell their goods under the NAVAJO trademark. *Id.*

The Navajo Nation asserts that, at least as early as March 16, 2009, Defendants have used "Navajo" and "Navaho" as names and marks in direct competition with NAVAJO-branded goods. *See id.* ¶¶ 5, 37. In early 2011, Plaintiffs allege that Urban Outfitters started a product line of 20 or more items containing the NAVAJO trademark, which they sold on their website and retail stores. *Id.* ¶ 41. Plaintiffs claim that Defendants' items sold under the "Navajo" and "Navaho" names and marks "evoke the Navajo Nation's tribal patterns, including geometric prints and designs fashioned to mimic and resemble Navajo Indian-made patterned clothing, jewelry and accessories." *Id.* ¶ 37. Plaintiffs assert that Defendants also used the NAVAJO mark in its internal search engine to divert customers to its products, thus engaging in initial interest confusion. *Id.* ¶ 40. Plaintiffs contend that Free People have sold and have continued to sell jewelry under the "Navajo" trademark and have used "Navajo" as a search term to display its retail goods. *Id.* ¶ 52. Plaintiffs attached as Exhibit C to their Amended Complaint copies of Defendants' webpages showing Free People's use of the "Navajo" mark as a search term." *Id.* and Ex. C (Doc. 30-2) at 2-3 of 29. Plaintiffs further assert Anthropologie "has sold items using the Navajo trademark as well." Am. Compl. (Doc. 30) ¶ 52.

Plaintiffs attached as Exhibit A to their Amended Complaint an illustrative, not exhaustive, list of Defendants' infringing activity. *Id.* ¶ 41. Exhibit A includes allegedly infringing products listed on the Urban Outfitters website, including, among others, "Deter

4

Navajo Tee," "Ecote Navajo Surplus Jacket," "Lucca Couture Navajo Pullover Sweater," "Navajo Bracelet," "Navajo Feather Earring," "Navajo Hipster Panty," "Navajo Print Fabric Wrapped Flask," "OBEY Navajo Glove," "Pendleton Navajo Weekender Bag," "Vintage Woolrich Navajo Jacket," and "Wide Navajo Scarf."  *See* Am. Compl., Ex. A (Doc. 30-1) at 2-24 of 41.   Exhibit A also contains allegedly infringing products sold from the Free People website, including items described as follows:  "Vintage Handmade Navajo Necklace," "Vintage Navajo Cuff," and "Joplin Fringe Bag" further described as a "[u]nique Navajo patterned blanket fringe bag . . . ."  *See id.* at 25-33 of 41.   Finally, Exhibit A includes web pages from Anthropologie that contain allegedly infringing products listed as "Navajo Blossom Pin."  *See id.* at 34-37 of 41.   Plaintiffs also list in an illustrative, not exhaustive, chart nine registered trademarks that Defendants have allegedly infringed.  *Id.* ¶ 54.

In addition, Plaintiffs contend that using their name to sell hip flasks and panties dilutes the Navajo Nation's goodwill in its trademarks.  Am. Compl. (Doc. 30) ¶ 47.  Plaintiffs argue that the use of "Navajo" with products like its "Navajo Flask" is derogatory, scandalous, and contrary to the Navajo Nation's principles because it has long banned the sale and consumption of alcohol within its borders and the Navajo Nation does not use its mark in conjunction with alcohol.  *Id.* ¶ 63.  Plaintiffs further contend that the misspelling of the "Navajo" name as "Navaho" is contrary to Navajo Nation law, is confusingly similar to Plaintiffs' own NAVAJO marks, and is scandalous and derogatory and should be enjoined.  *Id.* ¶ 66.

Plaintiffs also argue that Defendants' sale of products with significantly lower quality than Plaintiffs' own authentic products will likely harm the reputation of the NAVAJO name and mark.  *Id.* ¶ 64.  Plaintiffs argue that Defendants use of the "Navajo" name and mark to promote its "Navajo Collection" makes it very likely consumers will incorrectly believe that the "Navajo"

5

name is an indistinct term, rather than associate "NAVAJO" as a unique and inherently distinctive trademark. *See id.* ¶¶ 60-62.

Moreover, Plaintiffs assert that Defendants have offered for sale and sold products in an Indian style, motif, or design using terms like "Native American," "Indian," "Tribal," and the name of a particular Indian Tribe in a way that confuses customers into believing they are being offered or purchasing authentic Indian-made products, when in fact their products are not authentic Indian-made products. *See id.* ¶ 71, 76.  Plaintiffs contend that Defendants have falsely suggested their products are Indian products of the Navajo Nation. *See id.*  Plaintiffs attached as Exhibit E a sample of copies of Defendants' website pages where Defendants used search or identifier terms such as "Native American," "Indian," "Navajo," or the name of a particular Indian tribe. *See id.* ¶ 74 and Ex. E (Doc. 30-2) at 17-29 of 29.  Plaintiffs list examples of Defendants' products that falsely suggest they are Indian products and they include the "Navajo Bracelet," "Navajo Glove," "Vintage Men's Woolrich Navajo Jacket," and "Navajo Feather Earring." *Id.* ¶ 75.

The Navajo Nation sent to Urban Outfitters a "Cease and Desist" letter dated June 30, 2011, demanding that they cease using the "Navajo" trademark in connection of their sale of goods. Am. Compl., Ex. B (Doc. 30-1) at 39-41 of 41.  In response, on October 24, 2011, Urban Outfitters replaced the term "Navajo" with "Printed" on its website. Am. Compl. ¶ 50.  Plaintiffs assert, however, that Defendants have continued to sell their products in their retail stores under the "Navajo" and "Navaho" names and marks and have used the word "Navajo" on their sales receipts. *Id.* ¶ 51.

## II.   PROCEDURAL BACKGROUND

The Navajo Nation has brought suit against Defendants, claiming trademark

infringement, trademark dilution, unfair competition, false advertising, commercial practices laws violations, and violation of the Indian Arts and Crafts Act.  Specifically, Plaintiffs allege in Count One that Defendants' use of the "Navajo" and "Navaho" mark in connection with the sale of clothing, jewelry, house ware, footwear, and similar items is likely to cause confusion, mistake, or deception in the market place, and has created actual confusion in the market place, and constitutes trademark infringement in violation of 15 U.S.C. §§ 1114 and 1117 of the Lanham Act.[3]  *See* Am. Compl. (Doc. 30) ¶¶ 81-91.  In Count Two, Plaintiffs assert that Defendants' use of the "Navajo" and "Navaho" names and marks to promote, market, and sell its retail items constitutes willful Trademark Dilution by blurring, and willful Trademark Dilution by tarnishment under § 1125(c) of the Lanham Act.  *See id.* ¶¶ 92-96.  Plaintiffs contend in Count Three that Defendants' are also liable for Unfair Competition and False Advertising under § 1125(a) of the Lanham Act based on false advertising and infringement of the Navajo Nation's unregistered NAVAJO trademarks.  *See id.* ¶¶ 97-101.  In Count Four, Plaintiffs allege that Defendants violated the Indian Arts and Crafts Act, 25 U.S.C. § 305 *et seq.*, ("IACA") by offering, advertising, marketing, displaying for sale, and selling goods that falsely suggest Defendants' products are products of an Indian Tribe, when in fact they are not products of any Indian Tribe.  *See id.* ¶¶ 102-22.

Plaintiffs assert state law claims in the two remaining counts.  In Count Five, Plaintiffs contend that Defendants are liable for violation of the New Mexico Unfair Practices Act ("NMUPA"), N.M. Stat. Ann. § 57-12-3, through its sale of goods under the "Navajo" and "Navaho" names and trademarks, as well as its sale of other goods falsely represented as authentic goods, when Defendants knew that their goods were not made by, in connection, or in any way associated with the Navajo Nation, another Indian Tribe, nor any other Indian

---

[3] The Lanham Act is found at 15 U.S.C. §§ 1051 *et seq.*

organization or person. *See id.* ¶¶ 123-28. Finally, Plaintiffs allege in Count Six that Defendants' willfully committed acts and omissions caused dilution and/or tarnishment of the distinctive quality of the Navajo Nation's NAVAJO marks in violation of the New Mexico Trademark Act ("NMTA"), N.M. Stat. Ann. § 57-3B-15. *See id.* ¶¶ 129-33.

On April 30, 2012, Defendants filed a Motion to Dismiss the Complaint and Memorandum in Support (Doc. 16). Plaintiffs subsequently filed an Amended Complaint (Doc. 30). Defendants then filed a motion to dismiss the claims asserted in the Amended Complaint. The Court will deny Defendants' initial Motion to Dismiss (Doc. 16) as moot, and will now turn to the arguments made by Defendants in their Motion to Dismiss the Amended Complaint and Memorandum in Support (Doc. 33).

## III.   STANDARD

The Court can dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Plaintiff's complaint must set forth factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It is not enough for a plaintiff to just set forth labels, conclusions, and formulaic recitation of the elements of a cause of action. *Id.* When reviewing a plaintiff's complaint in ruling on a Rule 12(b)(6) motion, the Court must accept all well-pleaded allegations as true. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The Court must view the allegations in the light most favorable to the plaintiff. *Id.* The Court "will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). This plausibility standard does not require evidence of probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although presented as a motion to dismiss under the *Iqbal* standard, Defendants have attached a number of exhibits in support of their motion.  *See* Defs.' Mot., Exhibits (Doc. 33-1 through Doc. 33-12); Defs.' Reply, Exhibit A (Doc. 36-1).  Plaintiffs treat the motion as a true motion to dismiss and have not attached additional exhibits to their response, relying instead on the contents of their Amended Complaint and attachments thereto.

Federal Rule of Civil Procedure 12(d) applies when a party presents matters outside the pleadings:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).  Under Rule 12(d), a court has broad discretion to refuse to accept the extra-pleading materials and resolve the motion solely on the basis of the pleading itself.  *See Lowe v. Town of Fairland, Okl.*, 143 F.3d 1378, 1381 (10th Cir. 1998).  Reversible error may occur if a court considers matters outside the pleadings but fails to convert the motion to dismiss into a motion for summary judgment.  *Id.*  No conversion is required, however, when the court considers information that is subject to proper judicial notice or exhibits attached to the complaint, unless their authenticity is questioned.  *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).  *See also Rose v. Utah State Ba*r, 471 Fed. Appx. 818, 820 (10th Cir. Mar. 23, 2012) (unpublished opinion) (no conversion required where court takes judicial notice of its own files and records and facts that are matter of public record).  "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Venture Assoc. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

The Court will not convert Defendants' motion to dismiss into one for summary

judgment.  To do otherwise would require the Court to give notice to the parties and allow Plaintiff an opportunity to present its own extra-pleading evidence, an inefficient process better left for a motion for summary judgment filed in the normal course of the discovery process. Therefore, the Court will not consider the exhibits attached to Defendants' motion and reply that constitute extra-pleading material that are not properly the subject of judicial notice or that are not documents referred to in Plaintiffs' complaint and central to her claim.

With respect to Exhibits A, G, H, K, and L, they are various excerpts from the trademark file histories of some of the trademarks referred to in Plaintiffs' Amended Complaint. Defendants, however, have not provided authority that permits a court to consider excerpted portions of a trademark file history without converting a motion to dismiss into one for summary judgment.  This is not a situation where Plaintiffs attached to their complaint an incomplete document from a trademark file, and Defendants have merely sought to complete that same document in order to clarify or refute the meaning Plaintiffs subscribe to their portion of the record.  Instead, Defendants have cherry-picked portions of the USPTO's records to contest the merits of Plaintiffs' case or support their own defenses.  Other portions of those same records may support Plaintiffs' interpretation of the file histories, and thus the evidentiary value of the materials submitted by Defendants is subject to "reasonable dispute," and thus not best suited for judicial notice.  This evidentiary consideration is exactly the type of analysis suitable for summary judgment, not a motion to dismiss.  *Cf. Facebook, Inc. v. Teachbook.com LLC*, 819 F.Supp.2d 764, 771-73 (N.D. Ill. 2011) (refusing to consider extra-pleading materials filed by defendant to support its motion to dismiss, including USPTO records and an alleged admission made to the European trademark authority, as not properly the subject of judicial notice and not sufficiently central to Plaintiffs' complaint).  If Defendants' position were correct, the entire

10

trademark file history of each trademark allegedly infringed would nearly always be permissible to consider on a motion to dismiss in any trademark infringement case, an incredibly cumbersome analysis at the early stages of a case. *See id.* at 773 ("Indeed, allowing Teachbook to cherry pick portions of Facebook's website to introduce via a motion to dismiss simply because the complaint implicates the two websites would convert an examination of the complaint in to full-blown summary judgment analysis. This result would vitiate an otherwise narrow exception to the general rule that a motion under Rule 12(b)(6) stands or falls based on the allegations in the complaint.")  The Court therefore will not consider Exhibits A, G, H, K, or L at this time.

In support of their argument that "Navajo" is recognized by consumers as a generic descriptor of a category of "Indian-styled" prints and designs, Defendants attach Exhibits B (Doc. 33-2) (numerous fashion trend reports discussing popularity of "Navajo style"), C (Doc. 33-3) (copies of websites depicting numerous brands, including Lucky Brand and Calvin Klein, marketing "Navajo jeans" and "Navajo" mitts, wrap, and dress), D (Doc. 33-4) (blog from "Etc Blog Mag" showing celebrity Nicole Richie in "Isabel Marant Navajo jeans"), E (Doc. 33-5) (magazine article depicting "boho Navajo trend"), and F (Doc. 33-6) (photographs of third-party hangtags for "Navajo Blanket" shirt and "Navajo Seed Bead" bracelet).  These exhibits are not properly the subject of judicial notice, nor are they referred to in Plaintiffs' Amended Complaint. The Court therefore will not consider Exhibits B-F at this stage.

For similar reasons, the Court also declines to consider Exhibit I, the Declaration of Ed Looram, and Exhibit J, the Declaration of Ali Reich.  Other than the envelope showing when Defendants received the June 30, 2011 Cease-and-Desist letter, which arguably could be considered part of the letter attached to Plaintiffs' complaint, the remaining statements in Exhibit

I are not properly the subject of judicial notice and do not constitute documents referred to in

Plaintiffs' complaint.  Ali Reich avers the following in his Declaration:  he is a Vintage Buyer

for Free People; Free People's vintage products are pre-owned, "one-of-a-kind" items; of the

seven items identified as Vintage Navajo jewelry attached to the complaint, all the items "are

believed to be jewelry made by individuals who self-identify as Navajo Indian or are otherwise

enrolled in the Navajo Indian tribe."  Defs.' Mot., Ex. J (Doc. 33-10).  Although Mr. Reich is

referring to exhibits attached to Plaintiffs' Amended Complaint, his statements do not complete

the documents referred to in Plaintiffs' Amended Complaint, and the Court will also not consider

them.

## IV.    ANALYSIS

### A.    Lanham Act Claims

Congress enacted the Lanham Act in 1946 to provide national protection for trademarks

used in interstate and foreign commerce in order to promote competition and the maintenance of

product quality.  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193 (1985).  Under

the Lanham Act, the user of a mark can register it with the USPTO, and if the registrant then

satisfies further conditions including continuous use for five consecutive years, the right to use

the registered mark in commerce to designate the origin of the goods specified in the registration

becomes "incontestable," outside certain enumerated exceptions.  *KP Permanent Make-Up, Inc.*

*v. Lasting Impression I, Inc.*, 543 U.S. 111, 1117 (2004).  The Lanham Act provides a civil

action for the holder of a registered mark, whether or not incontestable, "against anyone

employing an imitation of it in commerce when 'such use is likely to cause confusion, or to

cause mistake, or to deceive.'"  *Id.* (quoting 15 U.S.C. § 1114(1)(a)).  To state a trademark

infringement claim under the Lanham Act, a plaintiff must allege facts showing that (1) its mark

is protectable, and (2) the defendant's use of an identical or similar mark in commerce is likely to cause confusion among consumers. *See Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1215 (10th Cir. 2004).

A mark is protectable if it is capable of distinguishing the products it marks from those of others. *Id*. at 1216. The eligibility for protection and the degree of protection afforded a mark depends upon which of five categories of terms the mark fits into: fanciful, arbitrary, suggestive, descriptive, or generic. *Id. See also Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593-94 (6th Cir. 1989) ("Validity of a registered trademark is contingent on determining first whether the mark is (1) arbitrary and fanciful; (2) suggestive; (3) descriptive; or (4) generic."). "The categorization of a mark is a factual question." *Donchez*, 392 F.3d at 1216. "Fanciful (made-up words expressly coined to serve as trade or service marks), arbitrary (common words applied in unfamiliar ways), and suggestive marks (words that connote, rather than describe, some quality or characteristic of a product or service) are inherently distinctive, and thus receive the greatest protection against infringement." *Id*. (10th Cir. 2004) (quoting *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 523 (4th Cir. 2002)). Suggestive marks require a consumer to use imagination and perception to determine the product's nature. *Sally Beauty Co., Inc. v. Beautyco, Inc*., 304 F.3d 964, 976 (10th Cir. 2002). Generic terms cannot be registered, and a registered mark may be canceled if it becomes generic. *Park 'N Fly, Inc.*, 469 U.S. at 194. "A generic term is one that refers to the genus of which the particular product is a species," in other words, it constitutes a common descriptive name. *Id. See also Sally Beauty Co.*, 304 F.3d at 976 (giving "cola" as an example of a general class of goods).

"A descriptive mark identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Sally Beauty Co*., 304 F.3d at 976. It is

protectable "only when it has acquired a secondary meaning by becoming distinctive in the applicant's goods in commerce." *Id.* (quotation omitted).  Geographically descriptive terms, like other descriptive terms, must acquire secondary meaning to be protected.  *See Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 866 n.11 (10th Cir. 2008).  Secondary meaning does not give the mark holder the exclusive right to use the mark in its original descriptive sense; rather, it gives the mark holder an exclusive right only in the secondary one associated with the mark holder's goods.  *Id.* at 866.  "The stronger the evidence of secondary meaning, the stronger the mark, and the more likely is confusion."  *Id.* (quoting *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 821 (9th Cir. 1980)).

The requirement of secondary meaning exists to protect commercial speakers' right to use descriptive words when informing consumers of the qualities of their own goods.  *See KP Permanent Make-Up, Inc.*, 543 U.S. at 122.  To acquire secondary meaning, one producer must have used the descriptive mark with reference to its goods for a sufficiently lengthy and exclusive amount of time that consumers consider the mark to mean the article is the producer's product.  *J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir. 1985). "Whether a mark has acquired a secondary meaning is a question of fact."  *Id.*  Evidence of secondary meaning may include the length and manner of the mark's use, the nature and extent of advertising and promotion of the mark, and the efforts made to create a conscious connection in the public's mind between the mark and a particular product.  *Donchez*, 392 F.3d at 1218.

The majority of courts hold that the USPTO's "decision to register a mark without requiring proof of secondary meaning creates a rebuttable presumption that the mark is suggestive, arbitrary, or fanciful rather than merely descriptive."  *GTE Corp. v. Williams*, 904 F.2d 536, 538 (10th Cir. 1990) (in dicta, citing cases supporting presumption but deciding case

14

on other grounds).  *See also George & Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d

383, 395 (4th Cir. 2009) ("[W]e are constrained to conclude that the LCR mark is suggestive.

We are obligated to defer to the determination of the USPTO, which constitutes *prima facie*

evidence of whether a mark is descriptive or suggestive."); *Lane Capital Management, Inc. v.*

*Lane Capital Management, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999) ("Registration by the PTO

without proof of secondary meaning creates the presumption that the mark is more than merely

descriptive, and, thus, that the mark is inherently distinctive.").  Prima facie evidence of the

validity of the registered mark, however, does "not preclude another person from proving any

legal or equitable defense or defect."  15 U.S.C. § 1115(a).  If the holder of the mark is entitled

to the statutory presumption, the burden of proof shifts to the party challenging the validity of the

mark.  *Burke-Parsons-Bowlby Corp.*, 871 F.2d at 593.

As noted previously, a registered mark may become "incontestable" through continuous

use for five consecutive years after federal registration and compliance with enumerated

statutory formalities.  *See* 15 U.S.C. § 1065; J. Thomas McCarthy, *McCarthy on Trademarks*,

§ 11:44 at 11-116 (4th ed. 2012).  "To the extent that the right to use the registered mark has

become incontestable under section 15 [15 USCS § 1065], the registration shall be conclusive

evidence of the *validity* of the registered mark, and of the registrant's exclusive right to use the

registered mark in commerce."  15 U.S.C. § 1115(b) (emphasis added).  As the Supreme Court

explained when construing § 1115:

> The Lanham Act expressly provides that before a mark becomes incontestable an
> opposing party may prove any legal or equitable defense which might have been
> asserted if the mark had not been registered. Thus, § 33(a) would have allowed
> respondent to challenge petitioner's mark as merely descriptive if the mark had
> not become incontestable. With respect to incontestable marks, however, § 33(b)
> provides that registration is *conclusive* evidence of the registrant's exclusive right
> to use the mark, subject to the conditions of § 15 and the seven defenses
> enumerated in § 33(b) itself. Mere descriptiveness is not recognized by either § 15

or § 33(b) as a basis for challenging an incontestable mark.

*Park 'N Fly, Inc*., 469 U.S. at 196 (internal citation omitted).  Consequently, the Supreme Court concluded that "the holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on the grounds that the mark is merely descriptive."  *Id*. at 205.

If, however, one of the enumerated defenses is established, registration constitutes only prima facie, not conclusive, evidence of the owner's right to exclusive use of the mark.  *Id*. at 199 n.6.  One of those defenses, § 33(b)(4), "allows the nontrademark use of descriptive terms used in an incontestable mark."  *Id*. at 201.  This "fair use" affirmative defense is available to a party whose allegedly infringing use "is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin . . . ."  15 U.S.C. § 1115(b)(4).

In addition to showing the validity of a mark, to prevail on an infringement claim under Section 32 of the Lanham Act, the plaintiff must also demonstrate that the defendant's use of the mark was likely to cause confusion in the marketplace.  *See* 15 U.S.C. § 1114; *GTE Corp.*, 904 F.2d at 539.  Even a plaintiff who is relying on an incontestable registration has the burden of proving likelihood of confusion.  *KP Permanent Make-Up, Inc*., 543 U.S. at 118.  Furthermore, although the validity of an incontestable mark may not be challenged, a defendant may still question the strength, and hence the scope of protection, of the mark as to different goods or services in determining the issue of likelihood of confusion.  McCarthy, § 11:45 at 11-117, § 32:155.  Courts look to the following factors to determine whether there is a "likelihood of confusion":   (1) the degree of similarity between the designation and the trademark in appearance, pronunciation of words used, verbal translation of the pictures or designs involved,

and suggestion; (2) the intent of the defendant in adopting the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by consumers; and (6) the strength or weakness of the marks. *Sally Beauty Co.*, 304 F.3d at 972; *J.M. Huber Corp.*, 778 F.2d at 1470.

With these principles in mind, the Court will turn to Defendants' arguments in support of their motion to dismiss.

### 1.    Fair Use Defense

Defendants argue that that the Lanham Act counts must be dismissed for failure to state a claim because Plaintiffs fail to allege facts showing that Defendants' use of the term "Navajo" was made to identify the source of Defendants' products and was made in bad faith.  Instead, Defendants contend that the term "Navajo" is fairly used as a descriptor for "Indian-styled" prints and designs that may include "geometric prints."   They assert that Plaintiffs inappropriately cropped the content of the websites, but that even what Plaintiffs attached to the Amended Complaint does not show that Defendants represented that the product was "put out" by the Navajo Nation.[4]

"Although a word may have acquired a secondary meaning, it still belongs to the public in its primary descriptive sense and any person may use it, provided he does so in such a way as not to convey the secondary meaning and deceive the purchasing public." *Hygrade Food Products Corp. v. H. D. Lee Mercantile Co.*, 46 F.2d 771, 772 (10th Cir. 1931).  *See also* 15 U.S.C. § 1115(b)(4) (codifying common law defense).  This defense is referred to as the fair use defense.  *See KP Permanent Make-Up, Inc.*, 543 U.S. at 123-24; *Sunmark, Inc. v. Ocean Spray Cranberries, Inc.*, 64 F.3d 1055, 1058 (7th Cir. 1995).  When the descriptive term has acquired secondary meaning for another's mark, a person using the term must accompany the term with

---

[4] Defendants did not attach the un-cropped version of the websites to their briefs.

such distinguishing marks that a buyer exercising ordinary care will not be deceived.  *Hygrade*, 46 F.2d at 773.  The fair use defense also requires that the use be in good faith.  *Sunmark*, 64 F.3d at 1058.  Whether the fair use defense applies is a factual question.  *Id.*

As an initial matter, Plaintiffs contend that resolution of this matter is not appropriate on a motion to dismiss because fair use is an affirmative defense, and thus, Plaintiffs have no obligation to plead facts to rebut an affirmative defense.  The Court agrees with Plaintiffs that generally they need only plead sufficient facts to state their infringement claim, and have no duty to plead facts to rebut an affirmative defense.  *See* Fed. R. Civ. P. 8.  Nevertheless, "there is no reason not to grant a motion to dismiss where the undisputed facts conclusively establish an affirmative defense as a matter of law."  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009).  *See also Hygrade*, 46 F.2d at 773 (concluding, as a matter of law, that the allegations were insufficient to show that consumers could be deceived by defendant's use of the mark where plaintiff used its trademark on food products, but defendant merely used the name "High Grade Food Stores" on its place of business, without so marking the goods offered for sale within).  Generally, however, dismissal for failure to state a claim "is appropriate in only the most extreme trademark infringement cases, such as where goods are unrelated as a matter of law, since the likelihood of confusion is generally a question of fact."  *Hensley*, 579 F.3d at 613 (quoting 32 *Federal Procedure, Lawyer's Edition* § 74:507 (2008)).

Plaintiffs next argue that their marks are incontestable and are fanciful, arbitrary, or suggestive, as strong source-identifiers for the Navajo Nation, and that the fair use defense is not available for such marks.  A number of courts, however, have rejected this latter argument, instead concluding that the key inquiry is the descriptiveness of the accused designation, not the descriptiveness of the plaintiff's trademark.  *See, e.g.*, *Car-Freshner Corp. v. S.C. Johnson &*

*Son, Inc.*, 70 F.3d 267, 269 (2d Cir. 1995); *Sunmark,* 64 F.3d at 1058.  *But see Institute for*

*Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1010 (3d Cir.

1991) (noting that fair use defense presupposed that plaintiff's mark is descriptive).  Neither

party cites a Tenth Circuit case addressing this issue; nor did the Court find one.  The Court,

however, does not need to resolve at this time the issue as to the availability of the fair use

defense when the mark is fanciful, arbitrary, or suggestive, because, as explained herein, even

assuming Defendants may properly assert the defense, Plaintiffs' Amended Complaint

sufficiently states a trademark infringement claim under the Lanham Act and does not

conclusively establish the applicability of the fair use defense as a matter of law.

Plaintiffs have alleged sufficient facts to show that Defendants have used the term

"Navajo" in a trademark sense and that Defendants did not sufficiently accompany "Navajo"

with such distinguishing marks that a buyer exercising ordinary care would not be deceived into

believing they were purchasing an item produced by the Navajo Nation.  The factual allegations

are also sufficient to show that the mark is likely to create confusion in the marketplace.  Unlike

in *Hygrade*, Plaintiffs here have alleged that Defendants' infringing use was on similar goods

that Plaintiffs market and sell, *e.g.*, clothing, jewelry, and other accessories, and that the goods

compete in many of the same channels of commerce.  *See*, *e.g.*, Am. Compl. (Doc. 30) ¶ 5.

Moreover, Plaintiffs have alleged facts that, when viewed in their favor, indicate that a buyer

exercising ordinary care might be deceived into thinking they were buying a product

manufactured by the Navajo Nation or a member thereof.  For example, Plaintiffs attached

evidence that Urban Outfitters advertised on its website "Navajo Bracelet" and "Navajo Feather

Earring" without clarifying words or images that "Navajo" did not mean that it was made by a

member of the Navajo Nation and was merely descriptive of the style.  *See* Am. Compl., Ex. A

19

(Doc. 30-1) at 7-8 of 41.   Similarly, Plaintiffs presented facts that Free People sold and advertised items such as a "Vintage Handmade Navajo Necklace," *id*. at 27 of 41, and that Anthropologie advertised items like a "Navajo Blossom pin," *id*. at 34 of 41, without clarifying information that "Navajo" did not indicate the source of the items.[5]  *See Sunmark*, 64 F.3d at 1059 ("When the products involved are similar, "likelihood of confusion" may amount to using a word in a "misleading" way, violating 15 U.S.C. § 1125(a)(1) – not because the likelihood of confusion makes the use nondescriptive, but because the confusion about the product's source shows that the words are being used, de facto, as a mark. And the defense is available only to one who uses the words of description "otherwise than as a mark.").

Unlike the cases cited by Defendants, the descriptive word at issue in this case, "Navajo," has a primary meaning that refers to the Navajo tribe, and its people.  *See* Webster's Third New International Dictionary of the English Language 1508 (3d ed. 1986) (defining "Navajo" as "an Athapaskan people of northern New Mexico and Arizona ranging also into Colorado and Utah – called also Diné" and as "a member of such people") (excerpt from Dictionary attached to Decl. of Karin B. Swope, Ex. A (Doc. 35-1) at 4 of 17).  It is true that "Navajo" has a geographic component, as well, linking members to a particular geographic region that encompasses the Navajo Nation.  *See id.*  Unlike other purely geographic marks, however, "Navajo" refers to the Navajo people and the Navajo tribe, and the tribe is the legal entity that has registered the "NAVAJO" marks in question.  Webster's Dictionary also defines "navajo blanket" and "navajo rug" as "a blanket woven by the Navaho in geometric designs of symbolic meaning."  *Id.* Although this definition shows that "Navajo" may be used as an adjective for a rug or blanket, it

---

[5]  Defendants also contend that Plaintiffs have not shown "use" of the "Navajo" trademark as to Defendant Anthropologie because the exhibits pertaining to Defendant Anthropologie note in the advertisement:  "We're sorry. This Product is no longer available."  They cite no cases, however, for this latter position.  Moreover, a factual inference could be made that the product is no longer available because all those particular goods had been sold from the site.  This is a fact question not suited to a motion to dismiss.

also demonstrates that, even when used as an adjective, the term conveys information that the source of the rug or blanket is the Navajo tribe or a member thereof.  Consequently, use of "Navajo" by Defendants, even as an adjective, could reasonably create a likelihood of confusion among consumers as to whether "Navajo" refers to the NAVAJO brand and the Navajo Nation as the source of the product.  *Cf. Baglin v. Cusenier Co.*, 221 U.S. 580, 592-93 (1911) ("If it be assumed that the monks took their name from the region in France in which they settled in the eleventh century, it still remains true that it became peculiarly their designation. And the word 'Chartreuse,' as applied to the liqueur which for generations they made and sold, cannot be regarded in a proper sense as a geographical name. It had exclusive reference to the fact that it was the liqueur made by the Carthusian monks at their monastery. . . .  It could not fail to be recognized at once that these were the distinctive designations of the liqueur made by the monks, and not geographical descriptions available to anyone who might make cordial in a given section of country. The same would have been true if the monks had voluntarily removed, and continued their manufacture elsewhere. . . .  This undoubtedly is a valid mark.").

The Court recognizes some items include another company's brand, such as Obey, in the product's description.  *See, e.g.,* Am. Compl., Ex. A (Doc. 30-1) at 11 of 41 ("OBEY Navajo Glove").  The Court cannot find as a matter of law, however, that the inclusion of a separate company's name in the product's advertised name eliminates all alleged confusion regarding the source of the product.  This issue is thus a fact question not suitable for determination on a motion to dismiss.  *Cf. Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1041-42 (9th Cir. 2010) (concluding that genuine issue of fact existed as to whether defendant's use of term "delicious" constituted fair use, where scope of defense varies with level of descriptive purity; jury could reasonably conclude lack of precautionary measures on tank top

21

outweighed evidence of some descriptive use; and defendant had many alternative words at its disposal to adequately capture its intended message).

Defendants nevertheless contend that Paragraphs 31 and 37 of the Amended Complaint "acknowledge, albeit indirectly, that the term 'navajo' is a descriptor for 'Indian-styled' prints and designs that may include . . . 'geometric prints.'" Defs.' Mot. (Doc. 33) at 10. At this stage, the Court must view the facts and all inferences in Plaintiffs' favor. The Court finds Defendants' argument without merit. For example, Paragraph 31 states that the NAVAJO trademark is a famous mark and is widely recognized by consumers as a mark for the Navajo Nation's Indian-styled and Indian-produced goods. Am. Compl. (Doc. 30) ¶ 31. The Amended Complaint alleges sufficient facts that consumers view the "NAVAJO" mark as a source identifier for the Navajo Nation.

Defendants additionally argue that Plaintiffs have themselves acknowledged that "fair use" of "Navajo" would include "Navajo Style Goods." To support this argument, Defendants rely on the license agreement executed by DDC and submitted to the USPTO in connection with the prosecution of Trademark Serial No. 76/700,672. This Court, however, will not consider evidence outside the record, and thus, will not consider this argument at this stage.

Defendants further contend that Plaintiffs have failed to show either improper trademark "use" or "bad faith" as to Defendant Free People because the "use" of the term "Navajo" is a descriptor of vintage, pre-owned items originally from artisans who identify as Navajo Indians. To prove the source of the vintage items, Defendants rely on the Declaration of Ms. Reich. The affidavit is less than a model of clarity to prove the truth of what is asserted. Ms. Reich avers that the items "are believed to be" jewelry made by individuals who self-identify as Navajo Indian without explaining the basis for her belief. Defs.' Mot., Ex. J (Doc. 33-10) ¶ 4. In any

22

event, the Court will not at this stage of the proceedings consider this extra-pleading Declaration.

Turning then to the facts as alleged in the Amended Complaint, the exhibits do not expressly say that the items were made by individuals who self-identify as Navajo Indians. For example, the only reference to "Navajo" in Exhibit A (Doc. 30-1) at 27 of 41 is "Vintage Handmade Navajo Necklace." The Court finds these allegations sufficient to state a claim that Defendant Free People is using the "Navajo" mark in a trademark sense that likely will confuse customers as to whether the vintage products originate from Plaintiffs. The fact question regarding whether the vintage items were indeed made by Navajo Indians is, once again, better left to summary judgment or trial.

Defendants also argue that "Navajo Beauty" as shown in Exhibit E (Doc. 30-2 at 26) was made by customer of Free People, and thus, does not constitute trademark "use" by Defendant Free People. Plaintiffs, however, have acknowledged that their claims do not encompass actions by Defendants' customers; rather, Plaintiffs allege that Defendants were using "Navajo" in their labeling and in their search engines to divert customers to their products. *See* Am. Compl. (Doc. 30) ¶ 40. The Tenth Circuit has recognized a Lanham Act claim based on "initial interest confusion," which "in the internet context derives from the unauthorized use of trademarks to divert internet traffic, thereby capitalizing on a trademark holder's goodwill." *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006). It is unclear from Exhibit E whether Defendants are responsible for using the phrase "Navajo Beauty" to describe one of the collections of their products, as the web page says the "Navajo Beauty" collection was created by "indiehippiepixie." Nevertheless, construing Plaintiffs' complaint in the light most favorable to them, the Court concludes that Plaintiffs have sufficiently alleged Defendants have used the term "Navajo" to divert internet traffic on their websites. The Court is therefore unwilling to decide

23

the particular issue of whether Defendant Free People infringed on the "NAVAJO" trademark when advertising the "Palmedo Blanket Bag" without development of the factual record concerning how Defendants allegedly used "Navajo" in their internal search engines to divert customers to products like the Palmedo Blanket Bag.

Finally, the Court cannot find, as a matter of law, that the "nominative fair use" doctrine warrants dismissal. Nominative fair use is a doctrine that applies when a defendant uses a mark to refer to the trademarked good itself and permits fair use of the mark so long as it does not inspire a mistaken belief by consumers that the speaker is sponsored or endorsed by the trademark holder. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010). The doctrine provides a fair use defense when a good is so well-known and so unique that it can effectively be identified only by use of its trademark. *See Swarovski Aktiengesellsschaft v. Building No. 19, Inc.*, 704 F.3d 44, 49 (1st Cir. 2013). The Ninth Circuit's test for nominative fair use is whether (1) the product is readily identifiable without use of the mark, (2) defendant used more of the mark than necessary, or (3) defendant falsely suggested he was sponsored or endorsed by the mark's holder. *Toyota Motor Sales*, 610 F.3d at 1175-76. Different circuits use the doctrine to measure different concepts and have endorsed different approaches to the doctrine. *Swarovski*, 704 F.3d at 52-53. *See also* McCarthy, § 23:11 (describing various circuits' views on nominative fair use). The Tenth Circuit does not appear to have endorsed the doctrine or formulated its approach to resolving the doctrine. *See Health Grades, Inc. v. Robert Wood Johnson Univ. Hosp., Inc.*, 634 F.Supp.2d 1226, 1241 (D. Colo. 2009). Assuming, without deciding, that the Tenth Circuit recognizes the doctrine, the Court concludes that whether "Navajo" is the only word reasonably available to describe the particular designs of the products at issue is a fact question not suitable for resolution at this time,

particularly where the Amended Complaint alleges that "geometric" or "southwestern" are alternative ways to describe the goods at issue.  *See* Am. Compl. (Doc. 30) ¶ 46.  Plaintiffs have sufficiently stated a claim of likelihood of confusion, not only as to source, but also as to sponsorship or endorsement.

**2.   Whether "Navajo" when used in connection with clothing and clothing accessories is a generic descriptor**

Defendants argue that "Navajo" is today a generic descriptor for a particular type of design and style of clothing and clothing accessory.  "When the relevant public ceases to identify a trademark with a particular source of a product or service but instead identifies the mark with a class of products or services regardless of source, that mark has become generic and is lost as an enforceable trademark."  *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 544 (10th Cir. 2000).  A plaintiff demonstrates secondary meaning in a mark when there is evidence that the consuming public understands the mark to denote a good coming from a single source.  *See Burke-Parsons-Bowlby Corp.*, 871 F.2d at 596.  Absent direct proof of secondary meaning, which is usually difficult to obtain, a court may draw reasonable inferences from evidence of long-term usage and considerable effort and expenditure of money toward developing a reputation and good will for the trademark.  *Id.*  Sales volume and advertising expense are relevant, although each standing alone may not establish secondary meaning.  *See id.*  Extensive advertising and a long duration of use of the mark may be sufficient to establish secondary meaning.  *See id.*

Without deciding whether "Navajo" is a descriptive, suggestive, arbitrary, or fanciful mark, the Court finds that Plaintiffs have alleged enough facts to show, at the very least, secondary meaning, and thus, that their mark is not generic.  Plaintiffs allege that the Navajo Nation and its people have been known by the name "Navajo" since 1849, and they have marketed and retailed clothing, housewares, and jewelry using the NAVAJO name and marks

25

since 1941.  Am. Compl. (Doc. 30) ¶ 3.  Further, the Amended Complaint states that Plaintiffs have invested substantial capital in promoting their trademark, resulting in more than $500 million in sales of NAVAJO-branded goods.  *Id.* ¶ 4.  These allegations of duration of use of the mark and successful advertising provide a factual basis to support their legal conclusion that consumers recognize the NAVAJO mark as indicating that the goods, including clothing and clothing accessories, come from Plaintiffs.

Defendants rely, in part, on Exhibits B-F in support of their argument, but as previously explained, the Court will not consider these extra-pleading exhibits.  Defendants also point to Exhibit E (Doc. 30-2 at 26) where "indiehippiepixie" describes a collection as "Navajo Beauty." The Court does not find that this one entry is sufficient to prove Defendants' argument about what the general public perceives as the meaning of "Navajo."  This argument is simply better suited for a motion for summary judgment or trial.

### 3.       Trademark Dilution (Count II)

The Lanham Act also provides that "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who . . . commences use of a mark . . . in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark . . . ."  15 U.S.C. § 1125(c).  Plaintiffs have alleged that Defendants' use of "Navajo" and "Navaho" in promoting, marketing, and selling their retail items constitute willful trademark dilution by blurring and tarnishment. Defendants argue Count II should be dismissed for a number of reasons.

First, Defendants contend that "Navajo" is not famous as a source of relevant goods. They argue that Plaintiffs represented to the USPTO that the "Navajo" mark was first used in connection with clothing such as shirts and jackets in 1995 and 2005 and that the Amended

26

Complaint is devoid of particular facts showing the extent and geographic reach of Plaintiffs' sales, advertising, and publicity.

The Lanham Act defines a "famous" mark as one that "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."   15 U.S.C. § 1125(c)(2)(A).   A court may consider all relevant factors including the duration, extent, and geographic reach of advertising and publicity of the mark; the amount, volume, and geographic extent of sales of goods offered under the mark; the extent of actual recognition of the mark; and whether the mark is registered on the principal register.  *Id.* § 1125(c)(2)(A)(i)-(iv).  Whether a mark is "famous" is a factual question.  *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012).   Fame for dilution requires a more stringent showing than fame for likelihood of confusion.   *Id*. at 1373.   Fame for dilution requires widespread recognition by the general public; in other words, it is a mark that has become a "household name."   *Id.* (quoting *Nissan Motor Co. v. Nissan Computer Corp*., 378 F.3d 1002, 1012 (9th Cir. 2004)).

To support their conclusory assertion of fame, Plaintiffs set forth that the Navajo Nation and its people have been known by "Navajo" since 1849; Plaintiffs have continuously used the NAVAJO trademark in commerce; Plaintiffs have marketed and retailed clothing, jewelry, and house wares since 1941; and Plaintiffs registered the NAVAJO trademark in 1943.   *See* Am. Compl. (Doc. 30) ¶ 3.  This evidence shows a significant duration of use of the mark.   Although Plaintiffs do not allege many non-conclusory facts concerning the geographic reach of their advertising, they do allege they have invested "substantial capital in promoting and protecting" the NAVAJO trademark, resulting in more than $500 million in sales of NAVAJO-branded goods, and that the NAVAJO marks are prominently featured on a number of Plaintiffs'

websites.  *Id.* ¶¶ 4, 30.  Additionally, they have alleged that the Navajo Nation has registered 86

trademarks using the NAVAJO component with the USPTO on the Principal Register.  *Id.* ¶ 3.[6]

Plaintiffs also more generally allege that the NAVAJO trademark is "a famous mark" and is

"broadly recognized by purchasers of consumer goods, including clothing, jewelry, and house

wares, and by the United States' general public as a trademark for the Navajo Nation's Indian-

styled and Indian-produced goods."  *Id.* ¶ 31.  Viewing all reasonable inferences in Plaintiffs'

favor, the Court concludes that these allegations are sufficient to create a factual issue

concerning the fame of the mark for dilution to survive dismissal at this stage.  *Cf. Cartier, Inc.*

*v. Deziner Wholesale, L.L.C.*, No. 98 Civ. 4947, 2000 WL 347171, at *6 (S.D.N.Y. April 3,

2000) (unpublished opinion) (granting plaintiff summary judgment on trademark dilution claim

after finding mark famous based on nationwide use of mark for 92 years in connection with

Cartier's luxury items and defendant was aware of cachet of Cartier name).

Defendants next contend that Plaintiffs have failed to state a dilution by blurring claim

because Plaintiffs have not shown how Defendants' use of "navajo" impairs the distinctiveness

of "Navajo."  The Lanham Act defines "dilution by blurring" as an "association arising from the

similarity between a mark . . . and a famous mark that impairs the distinctiveness of the famous

mark."  15 U.S.C. § 1125(c)(2)(B).  Plaintiffs allege that Defendants' use of "Navajo" in

retailing its 23 "Navajo" products and its marketing of its "Navajo Collection" makes it likely

that consumers will incorrectly believe that the "Navajo" mark is an indistinct term.  Am. Compl.

(Doc. 30) ¶ 60.  This allegation, in combination with the complaint as a whole, is sufficient to

state a dilution by blurring claim.  Defendants rely again on Exhibits B-F to show that consumers

---

[6] The Court recognizes that Defendants dispute that the named Plaintiffs have 86 registrations.  Indeed, Plaintiffs carefully allege that the Navajo Nation has registered 86 trademarks using the "NAVAJO component."  Am. Compl. (Doc. 30) ¶ 3.  Defendants, however, rely on outside evidence to support their position that the named Plaintiffs have only 31 registrations.  This dispute concerning the number of relevant trademarks owned by the Navajo Nation and the weight to give them on the issue of fame is better suited for summary judgment or trial.

and the fashion industry use "navajo" in connection with clothing and clothing accessories that do not originate with Plaintiffs.  The Court will not consider these extra-pleading materials, and thus, the dilution by blurring claim will remain in the case at this time.

Additionally, Defendants assert that Plaintiffs have failed to state a claim for dilution by tarnishment.  "Dilution by tarnishment" under the Lanham Act is association arising from the similarity between a mark and a famous mark that harms the reputation of the famous mark.  15 U.S.C. § 1125(c)(2)(C).  "Tarnishment occurs where a trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."  *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (internal quotations omitted).  Some courts have found tarnishment when a mark is placed in the context of sexual activity, obscenity, or illegal activity.  *Hormel Foods Corp. v. Jim Henson Productions, Inc*., 73 F.3d 497, 507 (2d Cir. 1996) (collecting cases).

Defendants contend that the "Navajo Print Fabric Wrapped Flask" is not a sufficiently unwholesome association to Plaintiffs' NAVAJO mark to constitute tarnishment.  They note that the Fire Rock Navajo Casino registered trademark includes "shot glasses" among its goods.  *See* Defs.' Mot., Ex. G (Doc. 33-7).  Plaintiffs allege harm to their reputation based on the Navajo Nation banning the sale and consumption of alcohol within its borders.  Although the Court has declined to consider extra-pleading materials, Plaintiffs admit that there is an exception for alcohol consumption within the confines of the dining areas of a Navajo Nation Gaming Enterprise facility.  Plaintiffs further admit that the Navajo Nation's Gaming Enterprise registered the "FIREROCK NAVAJO CASINO" mark for shot glasses used in the dining rooms of their gaming facilities.  In light of these admissions, the Court concludes, as a matter of law,

that Plaintiffs' allegations of tarnishment based on the use of "Navajo" with the "Navajo Print Fabric Wrapped Flask" are not sufficiently unwholesome or unsavory to support a tarnishment claim. *Cf. Ringling Brothers-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*, 937 F.Supp. 204, 211 (S.D.N.Y. 1996) (holding that circus could not succeed on tarnishment claim based on association of THE GREATEST SHOW ON EARTH mark with an adult establishment that serves alcohol where circus's own employee admitted that alcohol is served at some venues where circus performs and some of circus's restaurant sponsors also sell alcohol).

Plaintiffs also allege that Defendants' use of "Navaho" is "scandalous" because the Navajo Nation Code provides that the use of "Navajo" shall use the spelling "j", not "h." Am. Compl. (Doc. 30) ¶ 66. Plaintiffs have provided the Court with no authority for the proposition that misspelling a mark is "scandalous" and constitutes dilution by tarnishment, nor could the Court find any such authority. Significantly, Plaintiffs' own complaint notes that "Navaho" is a long-thought acceptable spelling. *See id.* ¶ 2 n.2. Furthermore, Plaintiffs rely on Webster's Third New International Dictionary in their briefs, which also uses "Navaho" and "Navajo" interchangeably. *See* Decl. of Karin B. Swope, Ex. A (Doc. 35-1) at 4 of 17. The Court finds that the alleged misspelling in this case is not sufficiently "scandalous" to state a claim for dilution by tarnishment.

Plaintiffs additionally allege a theory of dilution by tarnishment based on Defendants' marketing and retailing of products of significantly lower quality than the Navajo Nation's own products. Defendants argue that is a legal conclusion unsupported by any facts. Defendants also argue that Plaintiffs' own complaint shows that consumers are happy with Defendants' products, noting that the Exhibits attached to the Amended Complaint reveal that all of the products reviewed by consumers received at least a 3-star ranking, with the majority of products receiving

4.5 out of 5 stars.  The Court is not willing to find at this time that the star-ratings conclusively demonstrate the quality of Defendants' products.  Moreover, not all the products attached as Exhibits have been reviewed by consumers.  Although the factual allegations are somewhat conclusory as to the relative quality of the products, the Court finds the allegations sufficient to create a factual issue and will not dismiss the dilution by tarnishment claim based on the relative quality of the parties' goods.

Finally, Defendants, relying on Exhibit L, contend that Plaintiffs have admitted that their goods do not compete in many of the same channels of trade.  Because Exhibit L is an extra-pleading document, the Court will not consider the estoppel argument at this time.

For all the foregoing reasons, the Court will not dismiss Count II, but will limit the theory of dilution by tarnishment to that based on the relative quality of the parties' products.

### B.    Indian Arts and Crafts Act

The IACA "is a 'truth-in-advertising law designed to prevent products from being marketed as 'Indian made,' when the products are not, in fact, made by Indians as defined in the Act.'"  *Native American Arts, Inc. v. Bundy-Howard, Inc.*, 168 F.Supp.2d 905, 916-17 (N.D.Ill. 2001) (quoting Protection for Products of Indian Art and Craftsmanship, 59 Fed. Reg. 51908, 51909 (proposed Oct. 13, 1994)).  The IACA creates a cause of action "against a person who, directly or indirectly, offers or displays for sale or sells a good, with or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization."  25 U.S.C. § 305e(b) (as amended July 29, 2010).  In determining whether a defendant falsely suggested that it was selling Indian products, the question for the trier of fact is what the entire sales package, including advertising, labeling, and place of sale, suggested to the average consumer.

*See Native American Arts, Inc. v. Waldron Corp.*, 399 F.3d 871, 875 (7th Cir. 2005).

The IACA provides: "The term 'Indian product' has the meaning given the term in any regulation promulgated by the Secretary." *Id.* § 305e(a)(2). Those regulations define "Indian product" as "any art or craft product made by an Indian." 25 C.F.R. § 309.2(d)(1). The regulations provide the following illustrations of an "Indian product": an "Art" or a "Craft work" that is "made by an Indian that is in a traditional or non-traditional style or medium" or a "Handcraft made by an Indian, i.e. an object created with the help of only such devices as allow the manual skill of the maker to condition the shape and design of each individual product." *Id.* § 309.2(d)(2)(i)-(iii).

Defendants contend that Count IV should be dismissed because the allegations do not show that Defendants have falsely suggested that their products are Indian produced, Indian products, or the products of a particular Indian or Indian tribe. The Court disagrees. Plaintiffs allege that Defendants have displayed for marketing and retailing items such as "Navajo Bracelet," "Navajo Glove," "Vintage Men's Woolrich Navajo Jacket," and "Navajo Feather Earring." Am. Compl. (Doc. 30) ¶ 75. Plaintiffs contend that the products are in a traditional Indian style, and composed of Indian motifs and Indian designs, but are without identifier terms or labels; that the manner of marketing the goods falsely suggests the products are Indian products of the Navajo Nation, when in fact they are not Indian made; and that a consumer may find the products using search terms like "Indian," "Native American," "tribal," or "Navajo." *See id.* ¶¶ 76-77. Plaintiffs have sufficiently alleged facts to support a cause of action under the IACA to survive Defendants' motion to dismiss. *Cf. Native American Arts, Inc. v. Contract Specialties, Inc.*, 754 F.Supp.2d 386, 392 (D.R.I. 2010) ("NAA's allegations that, during a certain period of time, Specialties has passed off certain specified non-Indian products as Indian by,

among other things, describing them as 'Indian,' 'Navajo,' and 'Apache' is sufficient to satisfy the "short and plain statement of the claim" required by Rule 8(a)(2). Indeed, the allegations would be sufficient to state a claim even if Rule 9(b) were applicable (which it is not)."); *Native American Arts, Inc. v. Mangalick Enterprises, Inc.*, 633 F.Supp.2d 591, 599 (N.D. Ill. 2009) (holding that plaintiffs stated claim under IACA where exhibits attached to complaint depicted Indian or Indian-style goods sold by defendant and complaint included allegations that defendant acted in manner that falsely suggested it was selling authentic Indian goods); *Native American Arts, Inc. v. Peter Stone Co., U.S.A., Inc.*, No. 08CV3908, 2009 WL 1181483, at *4 (N.D. Ill. Apr. 30, 2009) (unpublished opinion) (denying defendant's motion to dismiss IACA claim because it was plausible that packaging could be falsely suggestive where defendant labeled jewelry as "Native American Design" and cardboard backings contain sublimated stereotypical Native American symbols, such as shadow of horse head with headdress-wearing rider and image of eagle feathers near "Native American" print).  *See also Native American Arts, Inc. v. Bundy-Howard, Inc.*, 168 F.Supp.2d 905, 912 (N.D.Ill. 2001) ("It follows then that if 'Indian' or 'Native American' is used in connection with a product, for purposes of the Act that equates to a representation that the product has been made by an Indian or certified artisan. If no Indian or certified artisan has in fact made the product, that representation falsely suggests that the product is of Indian origin, in violation of the statute.").

Defendants nevertheless contend that neither clothing nor clothing accessories constitute "arts" or "crafts" within the meaning of the IACA.  The IACA regulations, however, specifically contemplate that some apparel may constitute "Indian products":  "Apparel made or substantially decorated by an Indian, including, but not limited to parkas, jackets, coats, moccasins, boots, slippers, mukluks, mittens, gloves, gauntlets, dresses, and shirts, are Indian products."  25 C.F.R.

§ 309.15(a).  Specific examples of apparel that are "Indian products" include "seal skin parkas,

ribbon appliqué dance shawls, smoked moose hide slippers, deer skin boots, patchwork jackets,

calico ribbon shirts, wing dresses, and buckskin shirts."  *Id.* § 309.15(b).  None of the cases

Defendants cited stand for the proposition that contemporary clothing, as a matter of law, cannot

constitute an "art" or a "craft" under the IACA.  To the contrary, it appears that modern apparel

may fall within the definition of an "art" or "craft."  *See* Protection of Products of Indian Art and

Craftsmanship, 68 FR 35164-01 (June 12, 2003) ("The key definitions of Indian product, under

§ 309.2 describe art works and crafts as 'made by an Indian that are in a traditional or non-

traditional style or medium.' Therefore, it is understood that traditional and modern apparel, as

well as other traditional and modern art and craft works, are included in the range of Indian

products provided as examples.").  Defendants have thus not shown that this Court must dismiss

Plaintiffs' IACA claims based on "contemporary clothing" or "contemporary clothing

accessories" as a matter of law.

Defendants contend, however, that Plaintiffs should be precluded from basing an IACA

claim on clothing for the additional reason that Plaintiffs made representations to the USPTO

regarding the issuance of Registration 2,237,848.  Defendants have attached as Exhibit H

documents from Application Serial No. 75977971 for use of the "NAVAJO" mark for assorted

clothing items, among other things.  *See* Defs.' Mot., Ex. H (Doc. 33-8).  According to

Defendants, in response to a trademark examiner's refusal to register the mark because

registration could violate the IACA, Plaintiffs successfully argued:  "The goods offered under the

Mark are not art works, crafts, or handcrafts within these definitions contained in the Regulations

[for the IACA]."  *Id.* at 4 of 4.  Plaintiffs argue that this Court should not consider matters

outside the pleadings, and they contend that Defendants have taken this trademark filing out of

context for the position that the IACA does not cover clothing.

The Court is unwilling to make a conclusion regarding the merits of Defendants' judicial estoppel argument based on the limited record before it.  Plaintiffs have taken the position that the evidence is outside the scope of a Rule 12(b)(6) motion and have made only a cursory argument that the evidence was taken out of context.  As the Court previously ruled, it will not convert this motion into one for summary judgment and thus will not rely on any extra-pleading evidence to make a judicial estoppel finding at this stage of the case.  The Court therefore denies Defendants' request to dismiss Count IV from the Amended Complaint.[7]

### C.   New Mexico Unfair Practices Act

The NMUPA makes unlawful "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce."  N.M. Stat. Ann. § 57-12-3.  The NMUPA defines an "unfair or deceptive trade practice" as "a false or misleading oral or written

---

[7] Furthermore, even if this Court were to consider the extra-pleading materials, it is not clear that judicial estoppel applies.  "The doctrine of judicial estoppel is based upon protecting the integrity of the judicial system by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"  *Bradford v. Wiggins*, 516 F.3d 1189, 1194 (10th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)).  Courts must apply judicial estoppel with caution.  *Id.* The record here does not indicate on which date Applicant Navajo Jeans, Inc., took its written position that the goods under the NAVAJO mark did not fall within the definitions contained in the Regulations.  The regulations were not amended until June 2003 to include § 309.15, which gives examples of apparel that fall within the IACA.  It is therefore possible that a change in the law accounts for the change in position.  *See Longaberger Co. v. Kolt*, 586 F.3d 459, 470-71 (6th Cir. 2009) ("[J]udicial estoppel is not applicable where a party argues an inconsistent position based on a change in controlling law."); *Jarrard v. CDI Telecomms., Inc.*, 408 F.3d 905, 915 (7th Cir. 2005) (refusing to apply judicial estoppel where parties' change in position resulted from change in the law).  Moreover, this Court does not have the complete document regarding Plaintiffs' response to the trademark examiner's refusal to register the mark.  It is not entirely clear whether Plaintiffs' statement as to "goods" referred to particular types of clothing, or to contemporary clothing generally, and thus, the Court cannot make the determination that the position is directly inconsistent with their position here.  *See DeRosa v. National Envelope Corp.*, 595 F.3d 99, 104 (2d Cir. 2010) (explaining that, in determining whether to apply judicial estoppel, a court considers "whether the statements can be reconciled, not whether a fact-finder would necessarily adopt the interpretation which reconciles them").

statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person. . . ."  *Id.* § 57-12-2(D).  The Act provides a private remedy for "[a]ny person who suffers any loss of money . . . as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act."  *Id.* § 57-12-10(B).  A "person" is defined under the Act to include, "where applicable, natural persons, corporations, trusts, partnerships, associations, cooperative associations, clubs, companies, firms, joint ventures or syndicates."  *Id.* § 57-12-2(A).  To state a claim under the NMUPA, the plaintiff must show:  (1) that the defendant made an oral or written statement, visual description, or other representation that was either false or misleading; (2) that the false or misleading representation was knowingly made in connection with the sale of goods or services; (3) the conduct complained of occurred in the regular course of the representer's trade or commerce; and (4) the representation is of the type that may, tends to or does, deceive or mislead any person.  *Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100 (1991).

Defendants contend that Count V of the Amended Complaint must be dismissed because Plaintiffs do not have standing to bring a NMUPA claim because they are competitors, not "buyers," of the accused products.  Defendants rely on two cases in which the courts held that a seller of goods does not have standing to bring a claim under the NMUPA.  *See Guidance Endodontics, LLC, Dentsply Intern., Inc.*, 708 F.Supp.2d 1209, 1256-57 (D.N.M. 2010) (noting that NMUPA "must be brought by a purchaser, not a seller"); *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005-NMCA-051, ¶ 17, 137 N.M. 524, 113 P.3d 347 ("Consistent with its purpose as consumer protection legislation, the UPA gives standing only to buyers of goods or services.") (internal citations omitted).  The Honorable Judge James A.

36

Browning explained: "the very nature of the legislation at issue, to protect consumers, implies that only a consumer should be able to take advantage of its protections." *Guidance Endodontics*, 708 F.Supp.2d at 1256.

Plaintiffs correctly point out that the true holdings of both cases relied upon by Defendants is that a *seller* of goods cannot sue the *buyer* of its goods under the NMUPA. Both *Guidance Endodontics* and *Santa Fe Custom Shutters & Doors* involved a plaintiff suing the entity to which it was supplying its product. *See id.* at 1256-57. Neither case addressed the situation here, of a competitor who is suing a seller of goods for misrepresentations made to other buyers that caused harm to the competitor. In this case, even though the suit is brought to remedy alleged harms to the competitor, Plaintiffs have alleged that Defendants are making false representations to the consuming public, and thus, this suit serves the purposes of the legislation as a consumer protection statute, albeit indirectly. *See Hall v. Walter*, 969 P.2d 224, 234-35 (Colo. 1998) (concluding that misrepresentations directed to the market generally, in the form or widespread advertisement and deception of actual and prospective purchasers, implicates the public as consumers and are subject to Colorado's Consumer Protection Act). *See also John Labatt Ltd v. Molson Breweries*, 853 F.Supp. 965, 970 (E.D. Mich. 1994) ("[T]he intent of protecting consumers is well served by allowing suit to be brought by non-consumers who have a significant stake in the events. Allowing a competitor to bring suit under a statute designed ultimately to protect the interests of consumers is not a novel approach to enforcement, and is routine, for instance, in actions under the Lanham Act.").

Significantly, the plain language of the statute supports Plaintiffs' argument. Under the NMUPA, "any person" injured may sue and the statute broadly defines "person" to include corporations and other business entities. Numerous other states with similarly broad language in

their state trade practices acts have permitted business competitor standing. *See*, *e.g.*, *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (explaining that corporate competitors have standing to bring claim under New York deceptive trade practices statute so long as some harm to public at large is at issue); *Northwest Airlines, Inc. v. Ticket Exchange, Inc.*, 793 F.Supp. 976, 979-80 (W.D. Wash. 1992) (finding airline had claim under Washington's Consumer Protection Act for injunctive relief against frequent flyer ticket broker for misrepresentations made by the broker to ticket purchasers); *Hall v. Walter*, 969 P.2d at 234-35 (holding that, when certain requirements are met, non-consumers have standing to maintain private cause of action under Colorado Consumer Protection Act).[8]

In *Hall v. Walter*, the Colorado Supreme Court held that a non-consumer plaintiff had standing to bring a claim under the Colorado Consumer Protection Act ("CCPA"), sections 6-1-101 to -511, 2 C.R.S. (1998). *Hall*, 969 P.2d at 227, 230. The CCPA, like the NMUPA, is broadly worded to allow "any person" to have a civil action for any claim against any person who has engaged in or caused another to engage in any deceptive trade practice. *Id.* (quoting § 6-1-113, 2 C.R.S. (1998)). The Colorado Supreme Court rejected a reading of the statute that would limit the meaning of "any person" to "any consumer," given that the statute chose the expansive term "person" rather than "consumer." *Id.* at 231. After examining how courts in New York, Massachusetts, Illinois, and Washington construed similarly broadly worded "any

---

[8] There appears, however, to be no clear consensus among the states to convey business competitor standing, as many states have construed their state trade practices acts to cover only consumer transactions. *See*, *e.g.*, Staci Zaretsky, Trademark Law and Consumer Protection Law – Deception is a Cruel Act: "Uniform" State Deceptive Trade Practices Acts and their Deceptive Effects on the Trademark Claims of Corporate Competitors, 32 W. New Eng. L. Rev. 549, 550-551 & n. 13-15 (2010) (discussing split among states in whether to allow corporate competitor standing under unfair trade practices acts); D. Wes Sullenger, Only We Can Save You: When and Why Non-Consumer Businesses Have Standing to Sue Business Competitors under the Tennessee Consumer Protection Act, 35 U. Mem. L. Rev. 485, 501 & n.105 (2005) (advocating for why Tennessee consumer protection act should allow for business competitor standing and explaining how different states have interpreted their own state trade practices acts). Unlike in New Mexico, however, the unfair trade practices acts of many of the states limiting their acts to consumer transactions have statutory language limited to either "consumer" or to a person who purchased goods for personal, family, or household use. *See* Sullenger, at 501 & n.105.

person" language in their respective states' consumer protection acts, the Colorado Supreme Court adopted the Washington Supreme Court's five-factor test to establish a private right of action under the Washington Act.  *See id.* at 232-34.  The Colorado Supreme held that "any person" under the CCPA, means a person

> who establishes (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) *that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property*; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.

*Id.* at 235 (emphasis added).  As to the third "public interest component," the Colorado Supreme Court explained that it comported with the court's consistent characterization of the CCPA as addressing consumer concerns.  *Id.* at 234.

The Court finds the reasoning in *Hall v. Walter* compelling and believes that the New Mexico appellate courts, when directly addressing this issue, may similarly construe the "any person" language in the NMUPA to allow standing to a business competitor where the business competitor can show that the defendant's challenged practice significantly affects the public as actual or potential consumers of the defendant's goods or services.  The New Mexico case of *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, 142 N.M. 437, 166 P.3d 1091, supports this Court's broad reading of the statute.  Although in *Lohman* the plaintiff was a consumer, not a competitor, and is thus not directly on all fours with the case at hand, *see id.* ¶ 6, *Lohman* is instructive for the New Mexico Court of Appeals' liberal interpretation of the NMUPA and its holding that the NMUPA covers misrepresentations made by and between third parties in the course of commercial transactions, *id.* ¶ 26.

In *Lohman*, the plaintiff had purchased a vehicle manufactured by Defendants with an

allegedly defective seat belt buckle.  *See id.* ¶¶ 1, 6.  The plaintiff alleged that the defendant manufacturer conspired to conceal the deficiency by adopting an internal policy exempting the seat belt buckles from partial engagement testing and by falsely certifying that the buckles complied with the relevant federal regulation.  *Id.* ¶ 2.  The defendants argued that, because the alleged misrepresentations were essentially made to the National Highway Traffic Safety Administration, the plaintiff failed to state a claim because it relied on representations that reach consumers indirectly, if at all.  *See id.* ¶¶ 12, 20.  In rejecting the defendants' argument, the New Mexico Court of Appeals noted that § 57-12-2(D) prohibits misrepresentations "made in connection with the sale . . . of goods."  *Id.* ¶ 21.  The court concluded that the phrase "in connection with" encompasses "a broad array of commercial relationships" and that the language "does not suggest that a direct representation, by the defendant to the plaintiff, is a prerequisite." *Id.*  Furthermore, the court stated:  "The remedial purpose of the legislation, as a consumer protection measure, is also consistent with the broadest possible application."  *Id.* ¶ 25.  The court of appeals construed the NMUPA to cover misrepresentations made by and between third parties in the course of commercial transactions.  *Id.* ¶ 26.

The defendants in *Lohman* further argued that the plaintiff failed to state a NMUPA claim because there were no allegations concerning any transaction between the parties, and thus, the plaintiff could not show that any representation had been made in connection with the sale of goods.  *Id.* ¶ 28.  The New Mexico Court of Appeals rejected that argument as well and its reasoning is particularly relevant to this case:

> To begin with the plain language of the statute, we note that the definition of "unfair or deceptive trade practice" makes no mention of transactions between a claimant and a defendant.  *See generally § 57-12-2(*D). Nor does it require a misrepresentation *in the course of* a sale between plaintiff and defendant; it merely requires that a misrepresentation be "made *in connection with* the sale ... of goods" generally. *Id.* (emphasis added). Similarly, the UPA allows claims to be

brought by "[a]ny person" who suffers damages "as a result of any" unfair or deceptive practice by another.   NMSA 1978, § 57-12-10(B) (2005).   These provisions appear to be crafted so as to ensure that the UPA has a broad scope—arguably, broad enough to encompass misrepresentations which bear on downstream sales by and between third parties.

Turning to policy, the Court is reminded of the remedial purpose of the UPA and the principle favoring liberal application. *See State ex rel. Stratton v. Gurley Motor Co., 105 N.M. 803, 808, 737 P.2d 1180, 1185 (Ct. App. 1987)* ("Because the Unfair Practices Act constitutes remedial legislation, we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent.").

With respect to existing case law, we find no published authority to suggest that a transaction between a claimant and a defendant is required. Although DCC asserts that the case of *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005-NMCA-051, 137 N.M. 524, 113 P.3d 347, provides support for its position, we disagree. *Santa Fe Custom Shutters* rejected an invitation to expand the UPA to permit sellers to advance claims against buyers. This Court merely observed that "the UPA contemplates a plaintiff who seeks or acquires goods or services *and* a defendant who provides goods or services." *Id.* ¶ 14 (emphasis added). Contrary to DCC's suggestion, the pertinent language does not require the plaintiff to acquire goods or services *from* the defendant.

In summary, both the plain language of the act and the underlying policies suggest that a commercial transaction between a claimant and a defendant need not be alleged in order to sustain a UPA claim.

*Id*. ¶¶ 30-33.

Just as the *Lohman* court rejected an expansive reading of *Santa Fe Custom Shutters*, so too does this Court.  The Court finds that the language of *Santa Fe Custom Shutters* suggesting that a plaintiff must be a purchaser under the NMUPA, and the subsequent cases that have relied on that language, are limited to the facts presented in those cases and do not control the issue here.[9]  In none of those cases was the Court of Appeals presented with the issue of business

---

[9] Following *Lohman*, the New Mexico Court of Appeals again held that a seller cannot sue a buyer under the NMUPA.  *See Hicks v. Eller*, 2012-NMCA-061, ¶ 20, 280 P.3d 304 (holding that seller of paintings had no NMUPA claim against buyer and reiterating in that particular context that the plaintiff does not necessarily have to purchase the product from the defendant, but that somewhere along the purchasing chain, the claimant did purchase an item that was at

competitor standing.  *Cf.  Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc*., 190 Ill.App.3d 524, 532-33 (Ill.App.Ct. 1989) (construing statements in other Illinois appellate cases that, for business to have standing under Illinois consumer fraud act, business must be consumer of other's goods as dicta or as law limited to facts of the particular cases, and holding that business competitor may sue under Act).  Nor does this Court believe that the Court of Appeals was contemplating foreclosing such a suit by a business competitor when utilizing that language.

Rather, *Lohman* is a far more persuasive guide to how the New Mexico courts would view business competitor standing when directly confronting the issue.  According to *Lohman*, no commercial transaction between Plaintiffs and Defendants must be alleged.  *Lohman* further encourages courts to take a broad reading of the statutory language "any person" and of the meaning of misrepresentations "made *in connection with* the sale ... of goods" to ensure that the NMUPA's policy of consumer protection is met.  Given the broad statutory language in the NMUPA, the consumer protection policy underlying the NMUPA, and the compelling authority from other states with similar statutes as New Mexico's that allow business competitor standing where the deceptive act affects the public interest, this Court finds that there are good reasons to conclude that the New Mexico appellate courts, when viewing the particular legal issue of business competitor standing, may adopt the reasoning of the courts in those states that allow business competitor standing where the deceptive act affects the interest of the consuming public.  *See*, *e.g., Downers Grove Volkswagen, Inc.,* 190 Ill.App.3d at 534 (holding that business competitor, who is not a consumer, may sue under Illinois Consumer Fraud and Deceptive Business Practices Act where the alleged deceptive conduct "involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns").

---

some point sold by the defendant)

The briefing on this issue, however, has not directly addressed whether there is a public interest component to business competitor standing and/or whether Plaintiffs have sufficiently alleged a public interest component in their Amended Complaint. The Court would therefore like additional briefing from the parties on these issues.

Moreover, this Court is a federal district court exercising supplemental jurisdiction over the state NMUPA claim. Because this issue may be determinative of the state NMUPA claim in this case, there is no controlling authority on the issue, and resolving the issue may require formulating the proper test for business competitor standing, the Court, for reasons of comity, is inclined to certify the question to the New Mexico Supreme Court. *See* N.M.R.A. 12-607(A) ("The Supreme Court may answer by formal written opinion questions of law certified to it by a court of the United States ... if the answer may be determinative of an issue in pending litigation in the certifying court and the question is one for which answer is not provided by a controlling: (1) appellate opinion of the New Mexico Supreme Court or the New Mexico Court of Appeals. . . ."). *See also NMSA 1978, § 39-7-1 (providin*g for the "Uniform Certification of Questions of Law Act"); *Schlieter v. Carlos*, 108 N.M. 507, 508-09 (1989) (explaining that New Mexico Supreme Court has limited its acceptance of certification to cases in which there are no disputes concerning the factual predicates underlying the question certified and its answer would either dispose of the entire case or controversy or a pivotal issue that defines the future course of the case). The Court does not believe that certification would cause any delay in this case, given that discovery can proceed on all the other claims.

The Court thus would also like the parties' input regarding certification of the issue of business competitor standing. The parties must submit simultaneous briefs on or before April 15, 2013, setting forth their respective positions concerning a public interest component to

business competitor standing and whether certification is appropriate and warranted for the NMUPA claim.  If a party supports certification, the Court requests the party to submit a proposed question of law to be answered by the New Mexico Supreme Court and a rendition of the facts from the Amended Complaint that are relevant to the proposed question to be certified. The briefs should be no longer than 15 pages in length.  The Court will therefore stay its ruling on whether Plaintiffs have standing to pursue a claim under the NMUPA and on the merits of certification until after considering the parties' supplemental briefs.

**D.    New Mexico Trademark Act**

The purpose of the NMTA "is to provide a system of state trademark registration and protection substantially consistent with the federal system of trademark registration and protection under the Trademark Act of 1946, as amended."  N.M. Stat. Ann. § 57-3B-2.  Section 57-3B-15 states:  "The owner of a mark that is *famous in this state* shall be entitled . . . to an injunction against another's use of a mark . . . that causes dilution of the distinctive quality of the owner's mark. . . ."  N.M. Stat. Ann. § 57-3B-15 (emphasis added).

Defendants argue that Count VI must be dismissed because the factual allegations fail to support the legal allegation that Defendants used the term "Navajo" as a "source identifier" or "trademark."  This first argument is rejected for the same reasons given *supra* to support the Court's conclusion that Plaintiffs have alleged sufficient facts to create a factual issue that Defendants used "Navajo" as a trademark in violation of the Lanham Act.

Alternatively, Defendants contend that Plaintiffs' claim under the NMTA must be dismissed for failure to allege sufficient facts that the "Navajo" mark is famous *in New Mexico*. Plaintiffs allege that their products are famous across the United States and note the Navajo Nation's geographic continuity with New Mexico, but they do not specifically allege fame in

44

New Mexico.  Plaintiffs, however, ask to amend the Complaint to add fame "in New Mexico," if the Court finds it necessary.  The Court will grant Plaintiffs leave to amend their Amended Complaint to add the necessary factual allegations of fame in New Mexico.  The Court will therefore not dismiss Count VI.

      **IT IS THEREFORE ORDERED** that

1.      Defendants' Motion to Dismiss the Complaint and Memorandum in Support (**Doc. 16**) is **DENIED** as **MOOT**.

2.      Defendants' Motion to Dismiss the Amended Complaint and Memorandum in Support (**Doc. 33**) is **GRANTED** in part and **DENIED** in part as follows:

      a.      The motion is **GRANTED** to the limited extent that the Court dismisses as a matter of law the following *two theories* upon which Plaintiffs base their dilution by tarnishment claim in Count II:  (i) that Defendants' use of "Navaho" is "scandalous" because the Navajo Nation Code provides that the use of "Navajo" shall use the spelling "j", not "h;" and that (ii) Defendants' use of "Navajo" with products like its "Navajo Flask" is derogatory, scandalous, and contrary to the Navajo Nation's principles because it has long banned the sale and consumption of alcohol within its borders and the Navajo Nation does not use its mark in conjunction with alcohol.

      b.      The motion is **DENIED** as to all other theories of liability asserted by Plaintiffs in Count II, and Count II will remain in the case.

      c.      The Court will **RESERVE RULING** on Count V pending consideration of the parties' supplemental briefs setting forth their respective positions concerning whether there is a public interest component to business competitor standing, whether Plaintiffs have

sufficiently alleged a public interest component in their Amended Complaint, and whether certification is appropriate and warranted for the NMUPA claim.

        d.     In all other respects and as to all other counts, Defendants' motion to dismiss is **DENIED**.

    3.     All counts remain in this case.

    4.     Plaintiffs must file their amended complaint, addressing the issues discussed herein concerning Count VI, **within 10 days** of the entry of this Memorandum Opinion and Order.

    5.     The parties must file their supplemental briefs **on or before April 15, 2013**, on the Count V NMUPA issues discussed herein.

_____
SENIOR UNITED STATES DISTRICT JUDGE