**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| THE NAVAJO NATION, a sovereign Indian Nation, et. al,<br><br>Plaintiffs,<br><br>v.<br><br>URBAN OUTFITTERS, INC., a Delaware Corporation, et al.<br><br>Defendants. | CIVIL ACTION NO:<br><br>No. 1:12-cv-00195-KG-LAM |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PHILIP JOHNSON**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. MR. JOHNSON'S BACKGROUND AND REPORT ..... 1

A. Johnson's background ..... 1

B. Plaintiffs' allegations and Johnson's survey design ..... 2

III. ANALYSIS ..... 3

A. Legal standard ..... 3

B. Johnson used a survey design appropriate to the unique circumstances of this case and has not altered his *Whirlpool* design except as necessary to fit the facts here. ..... 5

1. Johnson used an appropriate survey design. ..... 5

2. Johnson did not alter his *Whirlpool* design by omitting a filter question, as Defendants falsely suggest. ..... 7

C. Johnson used no leading questions. ..... 7

1. Johnson did not create a "demand affect" akin to that discussed in Defendants' authorities. ..... 7

2. Johnson did not introduce the word "Navajo" through his questions because it was introduced by Defendants in their product pages. ..... 9

3. Mr. Poret explains how the use of Johnson's "quasi-filter" alleviates concerns about bias. ..... 9

4. Johnson's survey accurately reflected market conditions. ..... 10

D. Johnson used an appropriate control. ..... 11

E. Johnson used complete and accurate copies of Defendants' webpages identical to those used by Defendants' expert, Poret. ..... 12

F. Johnson investigated all Defendants' use of the infringing mark, unlike Poret, and his analysis relying on the *combined* responses of shoppers at Defendants' various store brands was based on a more-than adequate number of responses. ..... 13

IV. CONCLUSION .......... 14

## TABLE OF AUTHORITIES

**Cases**

*Bank of Utah v. Commercial Sec. Bank*, 369 F.2d 19 (10th Cir. 1966) ....................5

*Beneficial Corp. v. Beneficial Capital Corp*., 529 F. Supp. 445 (S.D.N.Y. 1982) ....................8

*Brunswick Corp. v. Spinit Reel Co*, 832 F.2d 513 (10th Cir 1987) ....................4, 5

*Coherent, Inc. v. Coherent Technologies, Inc*., 935 F.2d 1122 (10th Cir. 1992) ....................10

*Cumberland Packing Corp. v. Monsanto*, 32 F. Supp. 2d 561 (E.D.N.Y. 1999) ....................11

*Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993)....................3, 4, 14

*Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533 (10th Cir. 1996) ....................14

*IDV N. Am., Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815 (E.D.Va 1998) ....................8

*In Nabisco v. Warner Lambert Co.*, 32 F. Supp. 2d 690 (S.D.N.Y. 1999)....................11

*Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc.*, 19 F.3d 125 (3d Cir.1994)....................4

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987) ....................10

*Mastercard Int'l, Inc. v. First National Bank of Omaha, Inc.*, Nos. 02-3691 & 03-707, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) ....................14

*In re NW Airlines Corp Antitrust Litig.*, 197 F. Supp. 2d 908 (E.D. Mich. 2002)....................4

*PRLUSA Holdings, Inc. v. M&A Mktg. Corp.*, No. 99-10199, 2005 WL 6169313 (S.D.N.Y. Oct. 11, 2005)....................9

*Schering Corp. v. Pfizer, Inc.*,
189 F.3d 218 (2d Cir. 1999)....................5

*Simon Property Grp., L.P. v. mySimon, Inc.*,
104 F. Supp. 2d 1033 (S.D. Ind. 2000)....................4, 5, 6, 8, 11

*Smith v. Wal-Mart Stores, Inc.*,
537 F. Supp. 2d 1302, 1311 (2008)....................13

*THOIP v. The Walt Disney Co.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010)....................5, 6

*Union Carbide v. Ever-Ready, Inc.*,
531 F.2d 366 (7th Cir 1976)....................2, 5

*Wells Fargo & Co. v. WhenU.com, Inc.*,
293 F. Supp. 2d 734 (E.D. Mich. 2003)....................8

**Other Authorities**

Jerre B. Swann, William H. Brewster, J. David Mayberry and R. Charles Henn, Jr., "Likelihood of Confusion Surveys," KILPATRICK STOCKTON INTELLECTUAL PROPERTY DESK REFERENCE, 179 (Jan 1, 2009)....................8

MANUAL FOR COMPLEX LITIGATION §11.493 (4th Ed. 2014)....................4

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th Ed.)....................4

Shari S. Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Federal Judicial Center, 3d Ed. 2011)....................1, 2, 4, 7, 11

# I. INTRODUCTION

Philip Johnson is a highly credentialed and experienced expert in survey design with formal training in psychology and marketing that allows him to tailor his surveys to the unique circumstances of the assignment before him. He has implemented a survey design that he developed to deal with circumstances like those at issue here, appropriately modified to fit the specifics of this case. At least one other court has found a similar Johnson-designed survey to be admissible. Indeed, Mr. Johnson has explained why, based on his acknowledged and undisputable expertise, he considers other standard form surveys, such as the survey referred to as an "Eveready survey," inappropriate for use here. Yet, Defendants seek to have the Court exclude his testimony based on the misguided argument that only off-the-shelf survey designs can ever be used whenever the words "likelihood of confusion" appear as part of the surveyor's remit. Remarkably, Defendants argue this even though their own expert has not used any standard survey design either. They also seek to exclude Johnson's testimony by asserting baseless allegations that his design is biased and that he did not use the right control, both of which are untrue and as to which, even if the Court has any doubts about those arguments, these are matters for cross–examination not exclusion. Unfortunately, Defendants also base their attacks on serious misrepresentations of what Mr. Johnson has done, arguments that do not help the Court and cannot be a basis for exclusion.

# II. MR. JOHNSON'S BACKGROUND AND REPORT

## A. Johnson's background

Mr. Johnson has formal training in psychology and marketing and has frequently designed original surveys specifically designed to capture the nuances and individual features of the issue before him, as he has done here. Declaration of Philip Johnson ("Johnson Decl.") ¶ 4. This is the training recognized as providing an appropriate background for a person seeking to "design, conduct and analyze a survey." Shari S. Diamond, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 375 (Federal Judicial Center, 3d

Ed. 2011) ("Diamond, *FJC Reference Guide*") (explaining that survey experts "generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, political science, marketing, communication sciences, statistics or a related discipline"). In contrast, Mr. Poret, presents criticisms of Mr. Johnson's survey design on behalf of his clients despite having none of the academic training "generally" expected.[1]

**B. Plaintiffs' allegations and Johnson's survey design**

In the typical trademark infringement case, one company puts out for sale under its own brand a product using a brand name substantially similar to a senior user of an established brand. Whether the alleged junior infringer actually manufactures the product in one of its own company-owned facilities or subcontracts that work to someone else (or whether the product is made through some combination of in-house and external subcontracted processes) is irrelevant to the issue of infringement and is almost certainly something that no customer knows or cares about. Each of the potentially confusing products is sold to end users, which sales can occur through either similar or entirely different modes of sale. Because the infringing product bears only its own brand name, participants in a survey can be shown representations of the allegedly infringing product ***in isolation*** and asked questions about what that product suggests to them about who "put out" that product, a question that can discern whether customers are being misled (confused) into thinking that the allegedly infringing product is actually "put out" for sale by the senior trademark owner. This is the scenario at issue in the litigation, *Union Carbide v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), and in the mine run of trademark or copyright infringement matters that have followed the survey design approved by the *Ever-Ready* court. Those are not the facts here. Here, a ***retailer*** is accused of selling (not making or contracting for manufacture) products using the Navajo mark (not a mark ***similar*** to the Navajo mark, but the identical Navajo trademark) as a product name. It is impossible to show any survey participant

---

[1] Johnson does have training in statistics, but that background is entirely unhelpful here because no statistical methods were used in either the Johnson or Poret surveys.

the allegedly infringing product without simultaneously exposing them to both the infringer's legitimate marks (Urban Outfitters), and the allegedly infringing mark (Navajo).[2] The origin of source who consumers think made the products at issue, not who put them out, is precisely the issue in this litigation (since certainly anyone would respond that Urban Outfitters put them into the marketplace for sale). Mr. Poret identifies no instance where anyone has ever used an Eveready survey design in a situation such as this, and Plaintiffs have found no such example. Indeed, as explained in Plaintiffs' Motion to Exclude Mr. Poret's testimony (yet to be filed), Mr. Poret himself does not use a standard Eveready survey format so it is inexplicable how he can claim Mr. Johnson erred by not using a survey design he did not use himself.

Rather than use a demonstrably inappropriate survey design, Mr. Johnson used his expertise in survey design, acquired through both his educational background and his years of experience, to adopt an alternate survey design, one he has used before in a circumstance similar to that at issue here and that has been previously found admissible by another District Court. That survey included appropriate controls and appropriately used a "quasi-filter," a recognized practice in the field. Johnson Decl. at ¶18-19. This quasi-filter, which is omitted from all of Defendants' misquotations of Johnson's survey questions, was used instead of the less effective introductory question and filter used in an attempt to achieve the same goal when Mr. Johnson previously used this format in *Whirlpool*. *Id*. at ¶¶ 13-14 and 16-25.

## III. ANALYSIS

### A. Legal standard

As one court cautioned, quoting the United States Supreme Court's *Daubert* decision, "[t]hroughout its inquiry, this Court must remain mindful of its limited gatekeeping role: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible

[2] Indeed, as explained in more detail in Plaintiffs' Motion to Exclude Mr. Poret's testimony, in many instances it is impossible to show the products without exposing participants to at least three distinct valid brand names (such as "Obey, "Urban Outfitters" and "Navajo").

evidence . . . . These conventional devices, rather than wholesale exclusion . . . , are the appropriate safeguards where the basis of [expert] testimony meets the standards of Rule 702.'" *In re NW Airlines Corp Antitrust Litig.*, 197 F. Supp. 2d 908, 914 (E.D. Mich. 2002) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 596 (1993)). In particular, in the context of establishing admissibility of expert survey evidence, "once a survey had passed the threshold criteria for having a proper foundation, being relevant and having been conducted according to accepted principles, it can be admitted into evidence." 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ¶32:170 (4th Ed.). Courts need only consider a few limited questions in evaluating admissibility of survey evidence:

> [whether] the sample chosen was representative of [the] population; [whether] the data gathered were accurately reported; whether the data were analyzed in accordance with accepted statistical principles; whether the questions asked were clear and not leading; whether the survey was conducted by qualified persons following proper interview procedures; and whether the process was conducted so as to ensure objectivity.

MANUAL FOR COMPLEX LITIGATION ("MANUAL") §11.493 at 113 (4th Ed. 2014). When evaluating these factors a court must also recognize that "[t]he probative value of a consumer survey is a highly fact-specific determination." *Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 134 (3d Cir.1994) (internal quote omitted). Importantly, courts recognize the rather obvious point that "[n]o survey model is suitable for every case." *Simon Property Grp., L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000).

"The inquiry under Rule 703 … [f]or a survey … becomes, 'Was the … survey conducted in accordance with generally accepted survey principles …'" Diamond, *FJC Reference Guide* at 364 (quoting Manual for Complex Litigation §21.484 (1985)). "[T]echnical … deficiencies in [a] survey … relate not to the survey's admissibility but [to] the weight to be given such evidence." *Brunswick Corp. v. Spinit Reel Co*, 832 F.2d 513, 523 (10th Cir 1987).[3]

---

[3] The *Brunswick* Court also refers to "methodological" errors as going to the weight not admissibility; however, there is a good deal of confusion among courts as to this language.

Unlike Mr. Poret's survey, where the failings fall within those categories requiring exclusion under established case law, Defendants' criticisms of Johnson's survey do not suggest any deviation from "accepted principles," and so provide no basis for exclusion, even if, counterfactually, any of them were even worth any weight.

**B. Johnson used a survey design appropriate to the unique circumstances of this case and has not altered his *Whirlpool* design except as necessary to fit the facts here.**

**1. Johnson used an appropriate survey design.**

Defendants' core criticism that Johnson did not use an Eveready design can be readily dismissed. The mere fact that the Johnson Survey is not an Eveready design does not require exclusion. Indeed, the opposite is true – had Johnson used such a design that might have required exclusion because an Eveready design is facially inappropriate here. In an Eveready survey participants are only exposed to the claimed infringing product, and asked who they think puts out this product, why, and what other products are put out by the same concern. *Union Carbide v. Ever-Ready*, 531 F.2d at 385-86. Respondents are not shown the plaintiff's mark in such surveys. *Simon Properties*, at 1049; 6 MCCARTHY ON TRADEMARKS, §32:174. In contrast here, at issue are Navajo branded products sold by Urban Outfitters, so necessarily consumers will always see the marks together.

One court's explanation is particularly germane to understanding why the use of a survey based on the Eveready design is inappropriate here. In *THOIP v. The Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010) the court rejected use of an Eveready survey to measure

---

*Compare Brunswick*, 832 F.2d at 522-23 (stating that methodological issues go to weight not admissibility), *with Bank of Utah v. Commercial Sec. Bank*, 369 F.2d 19, 27-28 n.8 (10th Cir. 1966) ("Admissibility dependent on correct methodology[.]"). *See, generally, Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 225-26 (2d Cir. 1999) (laying out the inconsistent references present in court decisions as to whether methodological errors require exclusion of surveys, including *Brunswick*). Rather than perpetuate this confusion, Plaintiffs suggest it is better to follow the *Brunswick* court's clearer statement about "technical" deficiencies and the consistent views of the *Brunswick* and *Bank of Utah* courts that "[a] survey is trustworthy if it is shown to have been conducted according to generally accepted survey principles." *Brunswick*, 832 F.2d at 522; *see, also, Bank of Utah*, 369 F.2d at 27-28 n.8 (same).

confusion, explaining (based on the testimony of numerous marketing experts) that "an Eveready study would probably not be appropriate … to estimate confusion when two [products] are sold in many of the same outlets ... [but] is the appropriate design … where the products are in the same category of goods but are sold in ***different*** stores …" *Id.* at 235-36 (emphasis in original). Here, what is at issue is a product sold in a store that produces its own branded goods, and branded with the infringer's mark, so an Eveready survey is even less appropriate than it would be with two products sold in the same store. Notably, in criticizing Johnson, Mr. Poret does not refer to any court that has found an Eveready survey to be appropriate in a situation where, as here, two brand names necessarily both appear before a shopper when buying the goods. Eveready surveys are designed to test what happens when a good carrying one brand name is sold where that brand name might remind buyers of a different brand. And, as another court explains, "This [Eveready] format is obviously well suited to determine whether one trademark will confuse consumers ***who are not likely to encounter the two trademarks together***." *Simon Properties*, 104 F. Supp. 2d at 1049 (emphasis added). Those are the exact opposite of the facts here where the two marks, "Navajo" and "Urban Outfitters," are ***always*** seen together, on the website and in the stores. The questions for which the Eveready design was created and has been applied are simply not the issue here and Plaintiffs are unaware of any court that has held an Eveready survey appropriate for the problem here, namely where a retailer sells products using someone else's brand name. Certainly, neither Defendants nor Mr. Poret has identified any such example.

These authorities make clear that just labelling a problem as one involving "likelihood of confusion" does not mean that an Eveready survey is appropriate. Even within the simple context of a standard infringement matter, when the two products are sold in the same outlet, qualified survey experts and the courts do not consider Eveready surveys to be appropriate. *THOIP*, 690 F. Supp. 2d at 235-236; *Simon Properties*, 104 F. Supp. 2d at 1049.

**2. Johnson did not alter his *Whirlpool* design by omitting a filter question, as Defendants falsely suggest.**

Defendants suggestion that "Johnson has significantly altered the survey design used in the *Whirlpool* study" by omitting a filter "instruction" is without merit. Defs' Mem at 19-20 (emphasis omitted). That is demonstrably untrue. In fact, while Johnson used a "warm up" instruction as a filter in *Whirlpool*, Johnson Decl. at ¶13-15, and included a filter with the first question asked in *Whirlpool*, here he instead used the recognized and more effective method of including a "quasi-filter" (*id*. at ¶¶ 20-24) – a fact that was omitted in Defendants' misquotation of the questions asked in the Johnson survey.[4] The use of such quasi-filters is recognized as appropriate by experts in survey design. *See*, *FJC Reference Guide* at 390-91 ("the survey can use a quasi-filter question to reduce guessing by providing a 'don't know' or 'no opinion' option as part of the question."). Thus, whereas Defendants misquote the principal question asked in the Johnson survey as "what … does the word Navajo … tell you about this product" (Defs' Mem. at 9), in fact the question asked was "what, ***if anything***, does the word [Navajo] on this page tell you about this product?" Johnson Rpt at ¶28 (emphasis added); Johnson Decl. at ¶ 21. The words "if anything" are critical because they represent the use of a quasi-filter recognized by the *FJC Reference Guide*. *Id.* at ¶ 22. It is hard to understand how Defendants can believe they are providing legitimate argument when they simultaneously omit those words and accuse Johnson of not using a filter in his survey.

**C. Johnson used no leading questions.**

**1. Johnson did not create a "demand affect" akin to that discussed in Defendants' authorities.**

Defendants are also wrong when they claim that Johnson's mere inclusion of the word "Navajo" as part of his question is leading and likely to cause "demand effects." Defs' Mem at 7-8. Far from supporting this idea, Defendants' authorities explain why it is misguided. In the

[4] As Johnson explains, the "warm-up" instruction included in his Whirlpool survey did "not contribute to the measure of far use or confusion" because people simply don't offer such spontaneous comments, Johnson Decl. ¶15, so the omission of this warm-up that contributes nothing is of no consequence.

*Simon Properties* matter, the court found fault with the fact that the survey modified the so-called standard form *SquirtCo* format (sometimes also called the *Squirt* format) by adding an additional question that the court found suggestive. 104 F. Supp. 2d at 1048. But the *SquirtCo* format itself is one where respondents are specifically provided with an aided reference to the names of the products at issue, so that is clearly not the aspect of the survey that the court found problematic. *See*, Jerre B. Swann, William H. Brewster, J. David Mayberry and R. Charles Henn, Jr., "Likelihood of Confusion Surveys," KILPATRICK STOCKTON INTELLECTUAL PROPERTY DESK REFERENCE, at 179 (Jan 1, 2009) (explaining that whereas "in an EverReady survey an *unaided* comparison … is appropriate … [i]n a Squirt format … an *aided* comparison … is appropriate where the marks exist side by side in the market") (emphasis in original).[5] *See, also* Johnson Decl. at ¶26 (explaining how other standard form surveys point to the term at issue). Instead, what the *Simon Properties* court objected to was the inclusion of a particular additional question in the standard *SquirtCo* format which the court described as "ambiguous" and "likely to create a bias." That question asked whether people believed the two websites were "put out by 'related but different companies or organizations.'" *Simon*, 104 F. Supp. 2d at 1048 (quoting the survey at issue). The court pointed to other courts which had identified as problematic similar survey questions that ***suggested a relationship between the companies at issue***, when the presence of a perception of such a relationship is exactly what the survey was designed to test. *Id*. at 1048-49 (describing other cases with similar questions suggesting a business relationship between two companies, where the perception of such a relationship was what was being tested.)[6] Nothing remotely similar occurred here, where nothing about Mr. Johnson's survey introduced any

---

[5] Copy attached hereto as Exhibit A.

[6] Defendants' other authorities are all the same. *IDV N. Am., Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815, 830 (1998) (problematic question was one that "suggested a business relationship between the two products at issue"); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 768 (E.D. Mich. 2003) (design "suggested to respondents a link between [WhenU's] popup ads and [Wells Fargo's] websites."); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 450 (S.D.N.Y. 1982) (problematic question asked "Do you think there may or not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?").

suggestion of any relationship that his survey was designed to probe or suggested any answer to a question asked.

**2. Johnson did not introduce the word "Navajo" through his questions because it was introduced by Defendants in their product pages.**

The idea that bias exists merely because the questioner mentioned the word "Navajo" and then asked a question about who made the products has no support in logic or the law. As Mr. Johnson explains, unlike in the *PRL* matter, from which Defendants misleadingly quote his testimony, Defs' Mem. at 14 n. 27, here it was ***Defendants*** who introduced the term "Navajo" in their own websites. In *PRL*, by contrast, nowhere in any exhibit shown did the Ralph Lauren brand name ever appear, so there the surveyor's introduction of the brand name clearly altered what the respondents would have otherwise considered or been aware of when answering questions. *PRLUSA Holdings, Inc. v. M&A Mktg. Corp.*, No. 99-10199, 2005 WL 6169313 at *12 (S.D.N.Y. Oct. 11, 2005) (describing how the survey at issue conformed with the EverReady survey—which format includes ***not*** showing the plaintiff brand name—except for the addition of a question that "focused on and highlighted" the plaintiff Ralph Lauren brand to respondents); Johnson Decl. at ¶19 (explaining how in PRL "the survey researcher [took] it upon himself to introduce a brand name to the survey respondents. … [I]n this case, the researcher, Mr. Johnson, did not introduce the term 'Navajo' to the web pages that were shown in the survey, the Defendants did.")

**3. Mr. Poret explains how the use of Johnson's "quasi-filter" alleviates concerns about bias.**

Defendants' claim that mentioning the word "Navajo" creates bias is undermined by their own expert. Defendants claim that Johnson's questions "strongly suggests that respondents consider and come up with an answer as to what Navajo tells them." Defs' mem at 9. In fact, as Poret himself explains, any such possible bias would be removed if "there was [a] filter question or explicit option for answering 'nothing' or 'I don't know.'" Poret Decl. at 9. But this option was precisely and explicitly included in the ***actual*** question used in the Johnson survey, even

though it was omitted from the false version of the survey questions presented by Defendants in their memorandum (as previously explained). The actual question asked (as Poret quotes Johnson in his Declaration and as is explicitly stated in Mr. Johnson's Report) was "What ***if anything*** does the word [Navajo] on this page tell you about this product?" (emphasis added). Remarkably, given Mr. Poret's explicit acknowledgement that it would be important to include an option to "answer[] 'nothing' or 'I don't know,'" Defendants remove from what they present to this Court as a quotation of the Johnson survey questions that part of the question that specifically permitted respondents to give such an answer. Since in fact all questions asked included this quasi-filter allowing people to answer "nothing" or "I don't know," as Poret himself recognizes, this quasi filter is recognized and accepted within the realm of survey practitioners as a way to remove any risk of bias from the question about source.

**4. Johnson's survey accurately reflected market conditions.**

Finally, Defendants can point to no authority that suggests that merely pointing to a product at issue when asking a question is a deviation from actual market conditions that is so severe as to require exclusion of the survey. Every survey is a deviation from market conditions because people are being asked questions that they would not be asked when shopping. No court has ever found that the form of an asked question represented a deviation from market conditions (and certainly none of Defendants' authorities have so found).[7] This is hardly a surprise, because such a decision would be unsound. Everything about Johnson's survey (except the fact people are ultimately asked to answer some questions) was designed to mimic precisely the actual shopping experience at Urban Outfitters and its associated companies.

[7] *Coherent, Inc. v. Coherent Technologies, Inc.*, 935 F.2d 1122 (10th Cir. 1992), concerned two laser companies with similar names, yet the survey did not mimic any purchasing decision but simply asked people in a telephone poll where they thought the company called Coherent was located. *Id.* at 1126. In *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987), marks were shown side-by-side when that would never be how people would experience the products. *Id.* at 1488. In *Jordache* the survey was also considered, not excluded.

## D. Johnson used an appropriate control.

Defendants cannot dispute that use of a control—something Mr. Poret did not do at all—is appropriate. The particular control used by Johnson here was uniquely appropriate, and Defendants identify no authority that suggests that a mere quibble among experts as to whether the best possible control was used can be the basis for exclusion.[8] Unsurprisingly, this type of quibble about the minutia of a particular survey is precisely the type of issue best explored on the witness stand, where Plaintiffs are more than happy to have Johnson answer Defendants' questions about his control and for Plaintiffs to challenge Mr. Poret as to why he is willing to adopt positions on behalf of his client that directly contradict established standards of practice in the area of survey design.[9] Not only did Poret use no control himself, but his suggestion that the appropriate control for Johnson to have used is one that includes the word "Navajo" is directly contrary to standards of practice in survey design, as explained by the *FJC Reference Guide*, *supra*, at 399 (noting that a proper control should "share[] as many characteristics with the experimental stimulus as possible ***with the key exception of the characteristic whose influence is being assessed*** …") (emphasis added). Using as a control a phrase that include the word

[8] In *Cumberland Packing Corp. v. Monsanto*, 32 F. Supp. 2d 561 (E.D.N.Y. 1999), while the court criticized the control used (which control was facially inappropriate, in that it ignored that in responding to the survey respondents had identified that the color of the packets for artificial sweeteners was of great importance, something the control ignored), the court in fact did not exclude the survey but rather considered the results of the survey in reaching its decision. *Id*. at 575-79 (relying on the results of the criticized survey). In *Simon Properties*, the survey was excluded for many reasons, but the court's discussion of an inadequate control reflected fundamental problems that no effort was made at all to control for the fact that "Simon" is a common name associated with many products, services, entertainers, and others who have websites with "Simon" as part of their url. 104 F.Supp.2d at 1045. Indeed, the proponent of the excluded survey actually relied on a second expert whose testimony contradicted their own explanation why an adequate control had been used. *Id.* at 1046. Johnson does not contradict his own explanation why his control is appropriate. *In Nabisco v. Warner Lambert Co.*, 32 F. Supp. 2d 690 (S.D.N.Y. 1999), the court nowhere suggested that the criticized survey was inadmissible, but rather considered it and found it unpersuasive. Further, the control there bore no relationship whatsoever to the source of the confusion (both brands used "Ice" as part of its name), whereas here Johnson's control precisely matches Defendants' theory of the case: that Navajo merely reflects a design or pattern feature, which is what his control captures.

[9] Notably, Defendants chose not to depose Mr. Johnson prior to filing this motion to exclude his testimony.

"Navajo" as Poret and Defendants insist should have been used, fails this basic requirement that the control omit "the characteristic whose influence is being assessed." Instead, using as a control a word that precisely captures what Defendants' own theory suggests is meant by the word "Navajo" (a description of the product's pattern) represents not just an appropriate but the best form of control that can be found. *See* Johnson Decl. ¶¶ 30-32 (explaining how control was selected, including demonstrating that Webster's dictionary defines "geometric" (the control used by Johnson) to include precisely the type of product patterns and designs at issue here). Further evidence that the Johnson control is properly functioning is found in the fact that use of "geometric" as a control did indeed ferret out evidence of survey noise, exactly what use of a control, is intended to achieve. *Id*. at ¶¶33-34.

**E. Johnson used complete and accurate copies of Defendants' webpages identical to those used by Defendants' expert, Poret.**

It is hard to understand how Defendants can allege that Johnson "materially altered" the exhibits shown to participants (Defs' mem. at 15-16) when this is demonstrably untrue. Notably, this argument is entirely a lawyers' invention that is unsupported by Defendants' own survey expert, Mr. Poret. It is hardly surprising that Poret does not support this allegation because every example of materials allegedly "impermissibly removed and/or altered" that is identified as such by Defendants' counsel (*id*. at 16), was identically "removed and/or altered" ***in exactly the same*** way in the exhibits used by Mr. Poret in his survey. Johnson Decl. at ¶29 (reproducing Johnson's exhibits side-by-side with those used by Poret, showing that both omitted "the website title bar," "the complete product reviews" and every single other item identified by Defendants' counsel on page 16 of Defendants' memorandum). As Mr. Johnson explains, the allegation that his exhibits omit key details is:

> completely unfounded. The Johnson Survey exhibits were complete and accurate copies of webpages that were captured at the time they were running. Nothing was redacted from these webpages. … Moreover the exhibits used by [Mr. Poret] were either identical to the Johnson Survey exhibits or, in at least one instance, contained less information …"

*Id.* at ¶¶28-29. Once again, Defendants and their counsel do not help the Court in its decision-making by presenting demonstrably false statements in their memorandum.[10]

**F. Johnson investigated all Defendants' use of the infringing mark, unlike Poret, and his analysis relying on the *combined* responses of shoppers at Defendants' various store brands was based on a more-than adequate number of responses.**

Defendants focus on the fact that Johnson did not limit his analysis to only products sold by Urban Outfitters (as did Mr. Poret, omitting analysis relevant to a large proportion of the products at issue), and broke his sample down into a large subgroup who shopped at Urban Outfitters and smaller sub-groups who shopped at the other defendant outlets. To read Defendants' brief, one might think that Johnson relies heavily on a number of disaggregated results for each defendant individually including answers resulting from some questions asked to smaller groups of shoppers. But nothing could be further from the truth. His core results and analysis are based entirely on presentation of results for "All Respondents," with only secondary results shown breaking these aggregate results down by store or product. *See*, Johnson Rpt. at ¶¶36-41; Johnson Decl. at ¶16. None of Defendants' criticisms apply to either those aggregate results or to the results specific to products sold by Urban Outfitters, each of which standing alone shows a high level of source confusion. Further, as Johnson explains, at most even when

[10] Defendants also provide no authority that shows that omission of any of the specific information they identify renders a survey inadmissible. Their only authority, *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (2008), concerned someone running an explicitly anti-Wal-Mart website where he sold products such as t-shirts bearing the logo "Wal-Queda" (equating Wal-Mart with the terrorist group Al-Queda). *Id.* at 1311. The court there merely recognized that the only way a shopper would ever locate the products at issue was if they first went through Mr. Smith's home page which identified the website as one devoted to attacks on Wal-Mart. The survey design ignored that people would never even get to the product page at issue (selling the Wal-Queda t-shirt) unless they had already decided they had some interest in the content of the home page's anti-Wal-Mart message (or at least were not affirmatively repelled by that page), but instead ***forced*** participants to click through to the product page. As the court recognized, only people who tended to agree with the home-page message would subsequently click through to the product pages at issue. By omitting the option of stopping their search at the home page, the survey design omitted what might have been the most important piece of information in informing the decisions of people who actually purchased the products at issue. Nothing remotely comparable is at issue here.

looking at the subsamples, this raises an issue regarding the size of the measurement error (which Johnson has computed, but Poret, pointedly, despite his background in statistics, did not). Consistent with the authorities cited by Defendants,[11] if Defendants want to challenge the adequacy of the sample size for the sub-samples that are not the core of Mr. Johnson's results, they are free to do so at trial which is where this type of challenge to details of a survey belong.

Finally, in this Circuit "the sufficiency of the universe sampled[] bear[s] on the weight of the evidence, not the survey's admissibility." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,* 82 F.3d 1533, 1544 (10th Cir. 1996).

## IV. CONCLUSION

Mr. Johnson has applied his considerable and unquestioned expertise to design a consumer survey specifically designed to deal with the unique and idiosyncratic features of this litigation. Unlike Mr. Poret, he has properly applied a control and recognizes why other off-the-shelf survey formats are improper. His carefully conducted and appropriately designed survey which demonstrates the unsurprising fact that when people see a product described as a "Navajo earring," they think that means it was made by a member of the Navajo Nation, should be admitted.

---

[11] As throughout their brief, Defendants rely on dictum or misrepresentations of various decisions. Only one of Defendants' authorities involves a *Daubert* challenge, *Mastercard International, Inc. v. First National Bank of Omaha, Inc.,* Nos. 02-3691 & 03-707, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004). Each of the other cited decisions considers sample size as relevant to the weight to be put on survey evidence, not admissibility. Further, in each case survey size was but one of multiple issues the courts raised regarding the survey at issue. It is also to be noted that Defendants list the same case twice, once as *Mastercard v. FNBOA* and once as *FNBOA v. Mastercard* – simple comparison of the case numbers show these are the same case. Indeed, in that part of the July 15, 2004 *FNBOA v. Mastercard* decision discussing the survey evidence, Judge Cote expressly refers back to the discussion of the survey contained in her earlier February *Mastercard v. FNBOA* decision, so it is hard to understand how Defendants could have overlooked this.

RESPECTFULLY SUBMITTED this 7th day of April, 2015.

NAVAJO NATION DEPARTMENT OF JUSTICE
Harrison Tsosie, Attorney General

*/s/ Paul Spruhan*
Paul Spruhan, Assistant Attorney General
Post Office Box 2010
Window Rock, Arizona 86515
Telephone: 928/871-6937 / Fax: 928/871-6177
pspruhan@nndoj.org

KELLER ROHRBACK L.L.P.

*/s/ Mark A. Griffin*
Mark A. Griffin
Karin B. Swope
Raymond J. Farrow
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: 206/428-0561 / Fax: 206/623-3384
mgriffin@kellerrohrback.com
kswope@kellerrohrback.com
rfarrow@kellerrohrback.com

*Attorneys for The Navajo Nation*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 7th day of April, 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following counsel to be served by electronic means:

Scott R. Knapp
sknapp@dickinsonwright.com

Melissa A. Alcantara
malcantara@dickinsonwright.com

Alfred Green, Jr.
algreen@btblaw.com

Lindsay DeMoss
ldemoss@dickinsonwright.com

Samuel Littlepage
slittlepage@dickinsonwright.com

*/s/Mark A. Griffin*
Mark A. Griffin
Keller Rohrback L.L.P.

*Attorneys for The Navajo Nation*