IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

THE NAVAJO NATION, et al.,

    Plaintiffs,

vs.                                                    Civ. No. 12-195 BB/LAM

URBAN OUTFITTERS, INC., et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO GENERICNESS AND ABANDONMENT AFFIRMATIVE DEFENSES AND COUNTERCLAIMS [DOC. 470]

Plaintiffs, the Navajo Nation, the Navajo Arts and Crafts Enterprise, and the Diné Development Company (collectively, "Plaintiffs" or "the Nation") move for dismissal by summary judgment of Defendants Urban Outfitters, Inc.; Urban Outfitters Wholesale, Inc.; Free People of PA, LLC; and Anthropologie, Inc.'s (collectively, "Defendants") fifth and sixth affirmative defenses, and, in part, their first, third, and fourth counterclaims. [Doc. 470]. These affirmative defenses and, in part, the counterclaims are predicated on the theories that the "Navajo" trademark has become generic or that Plaintiffs have abandoned that mark.[1] Even viewing the evidence in the light most favorable to Defendants, the Court finds there is no admissible evidence in the record to support such affirmative defenses or counterclaims.

**I. Relevant Facts**

Defendants contend that the term "Navajo" is now "a generic name or designation for a fashion style or design," because Plaintiffs have allowed a multitude of third-parties to use that

---

[1] Defendants assert that Plaintiffs' trademarks have become generic through Plaintiffs' abandonment of them.

term. [Doc. 499] at 1. According to Defendants, the unauthorized third-party use of the term "Navajo" has caused it to cease to function as an indicator of a single source, and Plaintiffs have, thus, abandoned any rights they may have once had in that term. *Id.* For example, as to online commerce, Defendants argue, "Of the many dozens of Internet websites cited by Defendants, Plaintiffs can identify only 8 retailers who allegedly used the 'Navajo' mark with authorization." *Id.* at 6.

While only ten trademarks are at issue in this case, Plaintiffs have presented evidence that they currently have over 100 active registered trademarks. D. Harrison Tsosie Decl., [Doc. 246] at ¶¶ 10,18-22; [Doc. 246-2]. Defendants do not challenge the fact that the United States Patent and Trademark Office ("PTO") approved the registrations at issue without any proof of secondary meaning. [Doc. 295-1]; Michael Licata Decl., [Doc. 320] at ¶ 4. An agency of the federal government, the Indian Arts and Crafts Board ("IACB"), initially filed many of these registrations on behalf of the Nation prior to the passage of the Lanham Act. *See* [Docs. 182-2, 182-3, 182-4]; Tsosie Decl., [Doc. 246] at ¶ 10; [Doc. 470] at 25. Indeed, in 1980, Congress amended the Lanham Act to specifically provide, "The Indian Arts and Crafts Board will not be charged any fee to register Government trademarks of genuineness and quality for Indian products or for products of particular Indian tribes and groups." 15 U.S.C. § 1113(b); Lanham Act Amendments, Pub. L. No. 96–517 (HR 6933), § 5, 94 Stat. 3015 (1980). Among other things, the Indian Arts and Crafts Act ("IACA") designated the ICAB to police and enforce the Navajo Nation's trademarks. The IACA, thus, effectively became a statute to protect the trademarks of Indian tribes.

Congress was concerned enough about the infringement of Indian insignia and trademarks that in 1998 it commissioned the PTO to investigate whether current legal protections

were sufficient.  4 *McCarthy on Trademarks and Unfair Competition,* § 25:67.50 (4th ed).

Acknowledging that there are 500 federally recognized tribes, the PTO issued a 1999 report which concluded *inter alia:*

> The IACB (Indian Arts and Crafts Board) should continue its ongoing efforts to publicize the Indian Arts and Crafts Act, as amended in 1990, to inform both Native American tribes and the public of the precise scope, including limitations, of the IACB's statutory mandate.  [AND]
>
> In the case of Indian arts and crafts products, existing agencies [DOJ and FBI] already possess legal authority to take enforcement action on behalf of tribes for violations of the Indian Arts and Crafts Act.

*Id.*

## II.  Defendants have failed to Produce Admissible Evidence that "Navajo" is perceived as Generic

Defendants have presented no evidence contesting the Plaintiffs' registrations of the "Navajo" trademark.  Indeed, the expert tendered by Defendants, Robert Frank, acknowledged that his very cursory search of the PTO records turned up 35-40 such registrations.  [Doc. 706] at 11, 62.  While the registration of a trademark does not make it immune to a generic challenge, it does create a substantial barrier for the challenger.  If, as in this case, the PTO does not require proof of secondary meaning, a mark is presumed distinctive and valid.  15 U.S.C. § 1115(b) ("To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."); *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 976 (10th Cir. 2002).  Inherently distinctive marks are not generic as a matter of law.  *Beer Nuts, Inc.*, 711 F.2d at 939-40.

"A mark is generic if it is a common description of products … and refers to the genus of which the particular product … is a species." *Donchez v. Coors Brewing Co.,* 392 F.3d 1211, 1216 (10th Cir. 2004) (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 344 (2d Cir. 1999)). "Because a generic mark refers to a general class of goods, it does not indicate the particular source of an item. Consequently, such a mark receives no legal protection and may not be registered alone as a trademark." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir. 1983). *See also In re Steelbuilding.com*, 415 F.3d 1293 (Fed. Cir. 2005) ("A generic term, by definition, identifies a type of product, not the source of the product.").

Rather than arguing "Navajo" represents a particular genus of good of which the particular good at issue here is a species, Defendants contend "the evidence and opinions contained within the Goldaper Expert Report … demonstrate that the term 'Navajo' has become a stand-alone synonym in the fashion industry to designate a trend or fashion style, a print or color." [Doc. 499] at 22-23 (internal quotation marks omitted). A "trend or fashion style, a print or color" is not a genus of goods. Moreover, Defendants' employees and corporate representatives acknowledged that Plaintiffs' "Navajo" marks are valid trademarks.[2] Defendant Anthropologie, Inc.'s corporate representative also testified that Anthropologie, Inc. personnel knew they had to stop using "Navajo" and they took it off the website. Denise Albright Depo., [Doc. 471-1] at 138:15-18. The representative further noted, "They [knew] it's a trademark.

---

[2] Defendants maintain that they made that acknowledgement because of Plaintiffs' threat of a lawsuit. The record does not support this, however. Testimony by Defendants' Expert Witness, Robert Frank, [Doc. 706] at 62 (found 35-40 registered "Navajo" trademarks); [Doc. 637] at 18 (Defendants' counsel acknowledged "Navajo" trademark registrations at hearing on issue of laches affirmative defense). Nor is Defendants' claim that Plaintiffs themselves used the term generically supported by the record. The argument that Navajo silversmiths use the term "Navajo" to distinguish their designs from those of the Hopi or other tribes, or to describe their style as "contemporary" or "traditional" Navajo does not indicate a generic use. Instead, such a use of "Navajo" by Navajo silversmiths is the whole point of registering "Navajo" as a mark, i.e., to authenticate a product as produced by Navajo craftsmen.

4

That is very clear." *Id.* *See also* Steven Hartman Depo., [Doc. 243-7] at 526:23-527:3; David Alexander Hayne Depo., [Doc. 471-2] at 210:6-15; Charles Kessler Depo., [Doc. 471-3] at 56:6-9.  Defendants' employees and Fed. R. Civ. P. 30(b)(6) witnesses further testified that "Navajo" is not the primary signifier for a genus of goods, but if anything is a geographic designation. Albright Depo., [Doc. 243-8] at 216:23-218:11 (use random tribe names to describe "Indian" or southwestern style); Kate Brunner Depo., [Doc. 243-9] at 64:14-65:8 (use tribe name "to describe generic southwestern motif."); Jed Paulson Depo., [Doc. 243-10] at 163:2-8 (tribe name refers to southwestern origin or pattern).

As Judge Posner noted, "To determine that a trademark is generic and thus pitch it into the public domain is a fateful step." *Ty Inc. v. Softbelly's Inc.,* 353 F.3d 528, 531(7th Cir. 2003). Strong proof is, therefore, required to prove a previously protected mark has become generic. *Berner Intern. Corp. v. Mars Sales Co*., 987 F.2d 975, 982-83 (3d Cir. 1993); *V & V Food Products, Inc. v. Cacique Cheese Co., Inc*., 683 F. Supp. 662, 669 (N.D. Ill. 1988); *E. I. DuPont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F. Supp. 502, 523-24 (E.D. N.Y. 1975).  A strict construction of trademark forfeiture is especially appropriate given the origin of the "Navajo" mark and the fiduciary duty the United States owes the Indian Tribes.  *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (discussing fiduciary duty to Indian Tribes).  The NCAB, at the direction of the IACA, registered the Nation's first federal trademarks.  Even today, the NCAB continues to police the Nation's trademarks.  In 2013, for example, Pendleton Woolen Mills, a prominent national purveyor of blankets and jackets, ceased representing products as tribally sourced, and began including an IACA disclaimer, as a result of a settlement with the IACB.  *See* [Doc.182-1].  Indeed, the IACB has specifically warned Defendant Free People of PA, LLC in 2012 about its prior use of Indian tribe names without legal authority.  [Doc. 181-1].

Defendants rely on Mr. Frank as their expert to create a fact question on whether the Navajo mark has become generic. Mr. Frank created a company to conduct internet and trademark searches in order to advise clients whether a given trademark is available. He is qualified to do that, but the same methodology is ineffective to determine whether a previously registered trademark has become generic. *Charrette Corp. v. Bowater Communication Papers Inc.*, 13 U.S.P.Q.2d 2040, 1989 WL 274417, at *3 (T.T.A.B. 1989) (appearance of mark in cases and media articles as evidenced by LEXIS/NEXIS database search report is not proof that third-parties use mark or what impact mark may have on customers in marketplace).

Mr. Frank testified that he initially searched the Internet for the terms "Navajo" and "Navaho." After finding 42 million references to the word "Navajo," he modified the search to discover whether there is "a fashion trend out there, a Navajo trend, a Navajo style…." [Doc. 706] at 52. "Navajo style" and "Navajo trend" are two of the terms Defendants rely on as the basis for their argument that the "Navajo" brand has become generic. Initially, it must be noted that any attempt to look for "Navajo style" or "Navajo trend" would likely produce acknowledged knock-offs rather than goods similar to Defendants' which were simply advertised as "Navajo," e.g., a "Navajo bracelet" or "Navajo cuff." This indeed was Mr. Frank's result. Searching publications, he found, for instance, a 1981 Neiman Marcus advertisement referring to a product as "Navajo inspired." *Id.* at 53. This description is clearly different than representing an item as a "Navajo" produced product.[3]

---

[3] "A non-Indian maker of jewelry designed to look like jewelry made by Indians is free to advertise the similarity but if he uses the word 'Indian' he must qualify the usage so that consumers aren't confused and think they're buying not only the kind of jewelry that Indians make, but jewelry that Indians in fact made." *Native American Arts, Inc. v. Waldron Corp.*, 399 F.3d 871, 874 (7th Cir. 2005).

Mr. Frank then used the Wayback Machine to locate 39 products with "Navajo" in the name during the 2004-2012 time-frame. *Id.* at 53-54. He further found over 1,000 products with "Navajo" in advertisements for collectibles, jewelry, motors, clothing, and accessories. *Id.* at 56. From this, Mr. Frank concluded that the Navajo mark had been "diluted and weakened." He was, however, not willing to say that the term "Navajo" no longer represents an exclusive source for jewelry but reached that conclusion for clothing. *Id.* at 67-68.

Mr. Frank's use of this technique lacks probative value for deciding whether a name has become generic. The standard to determine whether a name is a generic is not whether the relevant public identifies a trademark with a particular source of a product, but is, instead, whether in the mind of the relevant public the primary significance of the mark is that it is identified with a class of products regardless of the source.[4] *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118 (1938) (plaintiff "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer."); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 544-45 (10th Cir. 2000) ("determinations of genericness are resolved under the statutory 'primary significance' test" under 15 U.S.C. § 1064(3)). Competitors, therefore, generally do not comprise the relevant public for purposes of determining genericness. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 718 F.2d 327, 330 (9th Cir. 1983), *cert. granted*, 465 U.S. 1078 (1984) *and judgment rev'd on other grounds*, 469 U.S. 189 (1985), *on remand to* 782 F.2d 1508 (9th Cir. 1986). Mr. Frank's broad search for "Navajo style" or "Navajo trend" simply does not address whether the relevant public believes that the primary significance of "Navajo," standing alone, indicates a class of products or a source.

---

[4] Defendants mention Mr. Hal Poret, who did indeed perform a consumer survey. However, by his own admission, Mr. Poret did not design his survey to measure whether consumers thought the Navajo name was generic. [Doc. 705] at 6 and 112.

Defendants further argue many fashion magazines have frequently referred to "Navajo styles," "Navajo patterns," and "dusty Navajo prints." Basic information found in trade journals is, however, irrelevant to the question of genericness, because that information only indicates what a term means to the producer, not to the consuming public. *Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1011-12 (8th Cir. 2011) (quoting *Anheuser–Busch, Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 638 (8th Cir.1984)). The genericness test asks what the mark signifies to the relevant public not to industry insiders. *Berner Intern. Corp.*, 987 F.2d at 983; *Magic Wand, Inc. v. RDB, Inc*., 940 F.2d 638, 641(Fed. Cir. 1991). Moreover, "[a] mixture of uses," some generic, some not, is insufficient to prove that a term is widely used as a generic name since, again, it is not proof of the public perception of the meaning of the term. *Baroness Small Estates, Inc*. *v. American Wine Trade, Inc.*, 104 U.S.P.Q.2d 1224, 1228, 2012 WL 4763149, at *5 (T.T.A.B. 2012). *See also Magic Wand, Inc.*, 940 F.2d at 641.

In sum, Defendants have not produced admissible evidence that the primary significance of the "Navajo" mark to relevant consumers is a class of products like a type of clothing. To the contrary, Defendants' own executives recognize "Navajo" as a trademark. Summary judgment is, therefore, appropriate as to the genericness affirmative defenses and counterclaims. *Argo v. Blue Cross and Blue Shield of Kansas, Inc*., 452 F.3d 1193, 1199 (10th Cir. 2006) (summary judgment warranted if evidence shows no genuine dispute of material fact and moving party entitled to judgment as matter of law); *Sanchez v. BNSF Ry. Co.,* 976 F. Supp. 2d 1265, 1269 (D.N.M. 2013) ("There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

## III. Defendants have failed to Produce Admissible Evidence that Plaintiffs Abandoned the Navajo Mark

A defendant may plead abandonment as a defense even against the owner of an "incontestable" federally registered mark. 15 U.S.C. § 1115(b)(2). The Lanham Act defines "abandonment" of a trademark to include its transformation from a distinctive mark into a generic word, if the trademark owner caused or aggravated that transformation by acts or omissions. 15 U.S.C. § 1127. In other words, a mark is abandoned only when all trademark significance is lost. *Leatherwood Scopes v. James M. Leatherwood*, 63 U.S.P.Q.2d 1699, 2002 WL 257394, at **4-5 (T.T.A.B. 2002). As in the determination of genericness, the critical inquiry does not involve the actions of the seller, but the meaning of the usage to the public. *DuPont Cellophane Co. v. Waxed Products Co*., 85 F.2d 75, 76 (2d Cir. 1936), *cert. denied*, 299 U.S. 601. A defendant asserting abandonment must strictly prove abandonment by clear and convincing evidence. *Doeblers' Pennsylvania Hybrids, Inc*. v. *Doebler*, 442 F.3d 812, 822, (3d Cir. 2006), *as amended*, May 5, 2006 (must "strictly" prove abandonment); *Cash Processing Services v. Ambient Entertainment, Inc*., 418 F. Supp. 2d 1227, 1231-1232, (D. Nev. 2006) (Ninth Circuit defines "strictly proved" as requiring clear and convincing evidence). *C.f. Standard Oil Co. v. Standard Oil Co*., 252 F.2d 65, 78 (10th Cir. 1958) ("[D]efendants could not excuse their wrongful acts on the ground that another had committed a similar wrong.").

"Defendants contend that Plaintiffs have abandoned the 'Navajo' marks by failing to enforce their purported rights in them." [Doc. 499] at 26. Defendants argue strenuously that prior to sending the cease and desist letters to Defendants, Plaintiffs had not warned any others using the Navajo name in the fashion industry to cease and desist. [Doc. 499] at 7 and 9. Obviously, a trademark holder is not required to sue every possible infringer immediately upon hearing of a possible infringement. *See Sara Lee Corp. v. Kayser-Roth*, 81 F.3d 455, 462 (4th

9

Cir. 1996); *Wallpaper Mfrs., Ltd. v. Crown Wallcovering Corp.*, 680 F.2d 755, 766 (3rd Cir. 1982).   In any event, courts are divided on whether failure to sue others using the trademark name is sufficient to prove abandonment or even relevant to that determination.  Compare, *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1181 (9th Cir. 1988) and *Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.*, 428 F. Supp. 689, 696 (N.D. Ga. 1977) with *Uncas Mfg. Co. v. Clark & Coombs Co.*, 309 F.2d 818, 820 (1st Cir. 1962).  At best, then, "the relevance of failure to prosecute to the strength question is a tenuous one."  3 *McCarthy on Trademarks and Unfair Competition*, § 17:17 (4th ed.).

Defendants also rely on Mr. Frank's report to show Plaintiffs have failed to police the "Navajo" marks and that the usage of the marks has proliferated to a point that they have become abandoned.  As noted above, "an owner is not required to act immediately against every possibly infringing use to avoid a holding of abandonment."  *Wallpaper Mfrs., Ltd.*, 680 F.2d at 766.  *See also Cullman Ventures, Inc.*, 717 F. Supp. at 126-27.  Additionally, the existence of third-party infringers does not by itself constitute abandonment of a mark where the mark owner does not consent to its use, provided that the mark does not lose all ability to identify the senior user.  *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516-17 (11th Cir. 1984); *STX, Inc. v. Bauer USA, Inc.*, 43 U.S.P.Q.2d 1492, 1997 WL 337578, at *13 (N.D. Cal. 1997).

In this case, Plaintiffs have continuously used their mark in commerce by marketing and selling goods branded with their "Navajo" marks, Barbara McGough Decl., [Doc. 262] at ¶¶ 5, 13-14, and 17-18; [Doc. 262-2] at 5; and Albert Damon Decl., [Doc. 306] at ¶¶ 2-6, 10-11, 14-

15, 18, 21-22, 24-32, and 34, and by licensing them, Tsosie Decl., [Doc. 246] at ¶¶ 26-27.[5] The evidence indicates both the Nation and NACB have taken steps to protect the "Navajo" mark by opposing trademark registrations by third-parties, sending 36 cease and desist letters to third-parties, and relying upon licensees to enforce the mark in numerous instances. Tsosie Decl., [Doc. 246] at ¶¶ 11-14, 24-25.

In conclusion, Defendants have failed to produce admissible evidence that Plaintiffs ever abandoned, or intended to abandon, their "Navajo" marks; nor have Defendants shown that Plaintiffs acquiesced to infringing use by failing to protect their mark. The Court will, likewise, grant Plaintiffs' motion for summary judgment with respect to the abandonment affirmative defenses and counterclaims.

IT IS ORDERED that

1. Plaintiffs' Motion and Memorandum for Summary Judgment as to Defendants' Fifth and Sixth Affirmative Defenses and First, Third and Fourth Counterclaims (Genericness and Abandonment) [Doc. 470] is Granted;

2. Summary judgment will be entered in Plaintiffs' favor on Defendants' fifth and sixth affirmative defenses, and on Defendants' first, third, and fourth counterclaims as they relate to genericness and abandonment; and

---

[5] Defendants spend time arguing about the terms of the licensing agreement and the dedication of the licensees to advancing the Navajo mark. This argument has no merit, because nothing in the licensing agreement gave the licensee the right or duty to protect the Navajo mark. *Propat Intern. Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007) (look to licensing agreement to analyze rights under agreement); *National Licensing Ass'n, LLC. v. Inland Joseph Fruit Co.*, 361 F.Supp.2d 1244, 1249-54 (E.D. Wash. 2004) (examine licensing agreement to determine rights and duties thereunder).

3. Those affirmative defenses and counterclaims will be dismissed with prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE